UNITED STATES of America, Appellee,

v.

James Felix KNIFE, Appellant.

UNITED STATES of America, Appellee,

v.

Leroy Lavern IYOTTE, Appellant.

Nos. 78–1391, 78–1394.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 17, 1978.

Decided Feb. 15, 1979.

---

Robert C. Riter, Jr., Riter, Mayer, Hofer & Riter, Pierre, S. D., for appellant, Knife.

Stanley E. Whiting, Day & Grossenburg, Winner, S. D., for appellant, Iyotte.

Gary G. Colbath, Asst. U. S. Atty., Sioux Falls, S. D., for appellee. David V. Vrooman, U. S. Atty., and John J. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., on the brief.

Before ROSS and McMILLIAN, Circuit Judges, and LARSON, Senior District Judge.*

LARSON, Senior District Judge.

Defendants James Felix Knife and Leroy Lavern Iyotte appeal from convictions entered against them following a jury trial in the United States District Court for the District of South Dakota, Central Division.[1] Defendants were indicted on two counts. Count I of the indictment charged that on or about the 15th day of October 1977, in the District of South Dakota at the White

---

* Earl R. Larson, Senior District Judge, District of Minnesota, sitting by designation.

1. The Honorable Andrew W. Bogue, United States District Judge, presided at the trial.

River Indian housing area, defendants did wilfully and unlawfully assault and aid, abet, counsel, induce and procure the assault of Patrolman Ted Huddleston of the White River Police Department with intent to murder, in violation of 18 U.S.C. §§ 1153 and 113(a). Count II of the indictment charged defendants with assault resulting in serious bodily injury, in violation of 18 U.S.C. §§ 1153 and 113(f).[2]

At the conclusion of the trial, the jury found defendant Knife not guilty as to Count I of the indictment but guilty as to Count II. Defendant Iyotte was found not guilty as to Count I but guilty of the lesser included offense of assault by striking, beating or wounding, 18 U.S.C. § 113(d). The jury also found defendant Iyotte guilty as charged in Count II of the indictment. The Court entered judgment accordingly on May 19, 1978,[3] and this appeal followed. For the reasons set forth below, we reverse as to defendant Knife but affirm as to defendant Iyotte.

 On appeal, defendants argue initially that the trial court erred in refusing to enter a judgment of acquittal for lack of evidence sufficient to convict. In examining this alleged error, under well established principles of review, we must assume the truth of the Government's evidence and give the Government the benefit of all reasonable inferences that logically may be drawn therefrom. *United States v. Cox,* 580 F.2d 317, 323 (8th Cir. 1978); *United States v. Wisdom,* 534 F.2d 1306, 1309 (8th Cir. 1976). We are further guided in our analysis by the general rule that it is not

necessary to sustain a conviction that the evidence "exclude every reasonable hypothesis except that of guilt [; it is enough] that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane,* 517 F.2d 1173, 1177 (8th Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). The essential elements of the charge may be proved by either direct or circumstantial evidence since circumstantial evidence is intrinsically as probative as direct evidence. *United States v. Cox, supra* at 323. The jury may not, however, be permitted to convict based upon mere conjecture or to conclude upon pure speculation or from passion, prejudice or sympathy. *Curley v. United States,* 81 U.S.App.D.C. 389, 392, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

We are well aware that the standard to be applied by an appellate court in determining sufficiency of the evidence is a strict one and that a jury's determination should not be overturned lightly. Moreover, we recognize that any review of the evidence by an appellate court is made difficult because it must necessarily be based on a cold record. Nonetheless, having examined the trial transcript in the instant case with care, we believe there was evidence insufficient to enable a reasonable jury to have found defendant Knife guilty beyond a reasonable doubt. Hence, as to defendant Knife we reverse.

At trial the Government did not allege, and no evidence was presented to suggest,

---

**2.** § 113. *Assaults within maritime and territorial jurisdiction.*

Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

\* \* \* \* \* \*

(a) Assault with intent to commit murder or rape, by imprisonment for not more than twenty years.

\* \* \* \* \* \*

(f) Assault resulting in serious bodily injury, by fine of not more than $10,000 or imprisonment for not more than ten years, or both.

§ 1153. Offenses committed within Indian country

Any Indian who commits against the person or property of another Indian or other person . . . assault with intent to commit murder, . . . assault resulting in serious bodily injury . . . shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States. . . .

**3.** Defendant Knife received a sentence of five years incarceration. Defendant Iyotte was sentenced to six months under Count I of the indictment and five years under Count II, the sentences to run concurrently.

that defendant Knife was a direct participant in the actual assault on Patrolman Huddleston. Instead, the Government attempted to demonstrate that defendant Knife had aided and abetted the assault by defendant Iyotte through his participation in a scheme to lure Patrolman Huddleston onto Indian property and into an ambush. This Court has recently reaffirmed that before a defendant can be convicted of aiding and abetting, it must be shown "that the defendant had a 'purposeful attitude' and in some manner participated in the unlawful deed. . . . Essentially, this requires the existence of 'some affirmative participation which at least encourages the perpetrator.'" *United States v. Holder,* 566 F.2d 617, 619 (8th Cir. 1977), quoting *United States v. Crow Dog,* 532 F.2d 1182, 1194–95 (8th Cir. 1976).

In the instant case, the only evidence adduced to suggest the basis for a "purposeful attitude" or intent on the part of defendants Knife and Iyotte to assault Patrolman Huddleston were two statements attributed to Knife after the shooting. The first statement, allegedly made by Knife while in the custody of FBI agents, was to the effect that tensions were high in the Indian community of White River because a Bruce Joseph White Buffalo had died in the Mellette County Jail on October 13, 1977, an act for which the Indian community blamed white Patrolman Huddleston. In addition, the Government introduced evidence that immediately after the shotgunning of Huddleston, Knife explained to Trooper Larry Ottenbacher of the South Dakota State Highway Patrol that "you didn't think we'd just let him off for killing one of our friends in the jail the other night, did you?"

There is some discrepancy in the testimony concerning the sequence of events that lead up to the actual shooting. Taking the evidence in the light most favorable to the Government, however, the jury could reasonably have found that immediately prior to the shooting incident on October 15, 1977, defendants Knife and Iyotte left the Indian housing area in Knife's blue and white pickup truck heading for downtown White River. They were accompanied by one or two other males according to Knife's neighbor, Joyce Black Wolf, who saw the truck leave the housing area and drive over the island dividing the highway into White River. In less than ten minutes, Joyce Black Wolf saw the pickup return followed by police vehicles.

During the interim, defendants Knife and Iyotte apparently went into the Municipal Liquor Store operated by Lester Ham. Despite uncontradicted testimony that defendant Knife had been drinking on and off for more than 24 hours, Ham testified that neither Knife nor Iyotte appeared intoxicated to him when they entered his store at about 4:30 p. m. Therefore, he served them. Before leaving the store after making his purchase, Knife pulled down a couple of paper signs and destroyed several displays in the liquor store.

After Knife and Iyotte left, Ham heard a commotion outside after which defendant Iyotte came running back into the store indicating he wanted to take an additional display. The commotion Ham heard occurred when defendant Knife carried a city garbage can into the middle of the street, turned it over and began to beat on it. There was some testimony that defendant Iyotte attempted to dissuade Knife from his antics. At any rate, both defendants subsequently got back into Knife's pickup and with a great deal of noise and screeching of tires pulled across the street and drove down the sidewalk on the opposite side of the street, finally stopping in front of the main grocery store in White River. At about this time, the Deputy Sheriff of Mellette County, Ed Hill, came around the corner onto main street. As soon as the defendants saw the Deputy's truck, they drove toward it and when Knife's pickup drew along side Deputy Sheriff Hill's vehicle, defendant Knife reportedly confronted Hill, inquiring of him, "I suppose you called for help?"

Hill had in fact called for assistance and shortly thereafter a State highway patrol vehicle driven by Trooper James Halverson arrived on the scene. As the highway pa-

trol car approached defendant Knife commenced driving slowly in the direction of the patrol car. As Knife passed the vehicle, a shouting match took place between Knife and Trooper Halverson. According to Halverson's testimony, Knife swerved to avoid hitting Halverson's car and as he did so yelled "So you want to kill Indians huh." After a further exchange of words, Knife started off driving slowly out of town. Trooper Halverson testified that he thought he saw the butt of a shotgun transferred among the passengers as the Knife vehicle pulled away and one of the passengers gestured to him in an obscene manner. Halverson re-entered his car, did a U-turn on main street and got behind the Knife pickup. As the highway patrol began to catch up to him, Knife entered the highway just west of main street and cut across the highway toward the Indian housing area. During this time, defendants continued to proceed at a slow rate of speed refusing to let Halverson around their vehicle. In addition, Knife was hollering out the window and waving the Trooper on.

As the Knife vehicle entered the Indian housing area, Ted Huddleston, responding to a call for help, was approaching from the southerly part of town but was at the time still some three blocks south of the entrance to the housing area. Huddleston had not been downtown prior to this time during the afternoon in question, although there was some testimony that he had at one point earlier in the day been parked across the highway from the Indian housing area while servicing his car. There was no testimony that Knife had seen Ted Huddleston prior to the shooting incident.

After Knife entered the Indian housing area, he pulled up onto his yard with Trooper Halverson in pursuit, despite the fact that Halverson had been told by the city police officer, Ted Huddleston, that he should not follow since he had no jurisdiction in the Indian housing area.[4] Knife and the other passengers in the Knife pickup exited the vehicle and Knife, along with two other individuals, approached Trooper Halverson who by then had gotten out of his own car. Knife told Halverson to get off his land since Halverson had no jurisdiction there. When Halverson refused, he and Knife began to push and shove each other.

By this time Patrolman Huddleston had entered the Indian housing area, parked a distance apart and to the north of Halverson's vehicle, gotten out of his own vehicle and was observing the confrontation between Knife and Halverson. At this time Knife's back was toward Huddleston but Leroy Iyotte saw the city patrol officer. One of the other individuals who had accompanied Knife and Iyotte downtown, probably Ronny Moran, tossed a gun to Iyotte and Iyotte ran toward Huddleston, backing him into his patrol car and ordering him to give up his gun and his mace from his belt. Iyotte had the shotgun leveled at Huddleston, waving it in his face and prodding him back into the patrol car. At one point, Iyotte hit Huddleston in the face with the muzzle of the gun with sufficient force to leave a scar. Iyotte then pushed the gun into Huddleston's side and looked away from him for a moment toward the confrontation between Knife and Halverson. According to Huddleston, when Iyotte turned around, "the gun went off" causing serious bodily injury to Huddleston.

During this period of time, Knife was being restrained by two of his brothers. After hearing the shot from the gun held by Iyotte, Trooper Halverson drew his own weapon and shot Iyotte. Thereafter, Iyotte was shot once or twice by city patrolman Huddleston. Following the shooting of Iyotte, Knife, who was ranting and raving, was restrained and taken to a highway patrol car. It was during this time that he allegedly made the statement to Trooper

---

4. In this regard, there was testimony by various witnesses at trial to the effect that the city police officers, sheriff's department employees and highway patrol officers without special Bureau of Indian Affairs certification did not normally enter the Indian housing area to make arrests but would instead stop at the entrance because they lacked jurisdiction to proceed further.

Ottenbacher to the effect that "you didn't think we'd just let him off for killing one of our friends in the jail the other night, did you?"[5] Also during this time, there was testimony that Knife obtained access to the CB radio in the patrol car in which he was sitting and was heard by residents of White River to call out "501–A, where are you, Bowman, you chicken shit? You, too Janklow. I am on the state radio, too." Thereafter Knife was transferred from one patrol car to another and was eventually transported to Pierre, South Dakota.

None of the witnesses at the trial testified to having seen defendant Knife with a weapon in his hand at any time on October 15, 1977. None heard Knife encourage Iyotte to go to Huddleston's vehicle or to shoot the city officer. In fact, Leroy Iyotte testified at trial that Knife did not encourage him to go over to the police car or to take a weapon to the area where Huddleston was standing.

■ The Government's theory throughout the case was that James Knife and Leroy Iyotte went into town on the afternoon of October 15, 1977, for the express purpose of creating a ruckus with the expectation that Ted Huddleston would respond, thereby affording them an opportunity to carry out their planned assault. The Government stated that the event that precipitated the shotgunning of Huddleston was the death of an Indian inmate in the White River City Jail. To support its conclusion, the Government relied on Knife's statement to FBI agents concerning the tensions within the Indian community. That statement, to the effect that the Indian community blamed Huddleston for the death of White Buffalo, however, while possibly providing a motive for the assault, does not alone establish a purpose or intent. Nor we think is the statement made by James Knife to Trooper Ottenbacher fol-

lowing the shooting of both Huddleston and Iyotte necessarily indicative of a preconceived plan or purpose to assault Huddleston. It must be remembered that the statement was made by Knife after the fact, in the heat of passion, while under the influence of alcohol and under the belief that his friend Leroy Iyotte was dead. In this context, the statement appears to us to have been as readily an explanation or rationalization by Knife for an accomplished fact—the shotgunning of Huddleston—as a statement of intent.

■ Beyond these two statements, the Government's case against Knife rests largely on three other statements attributed to him and the inferences to be drawn therefrom. The first such statement is Knife's inquiry of Deputy Sheriff Hill, "I suppose you called for help?" The Government suggests the question was posed in obvious anticipation that Hill had summoned Huddleston. No evidence was presented at trial, however, to suggest that Huddleston was the only officer generally available to respond to such calls for help or that defendants Knife and Iyotte would reasonably have expected him to respond. Indeed, the testimony produced at trial indicated that other State and County law enforcement people were available in White River to assist Deputy Hill.

The next statement on which the Government relies is Knife's accusation directed at Trooper Halverson, "So you want to kill Indians, huh." Even if it is conceded that this statement and the other barbs hurled at Halverson by Knife indicate animosity or hostility on the part of Knife toward white law enforcement personnel, the statement does not constitute a direct threat of harm. Indeed, despite whatever animosity existed toward Halverson, neither Knife nor his male companions assaulted Halverson when he approached the Knife pickup on main

5. The statement itself was contained in a written report filed by Trooper Larry Ottenbacher of the South Dakota Highway Patrol after the arrest of James Knife. When asked by the prosecutor on cross-examination whether he had made the statement, defendant Knife indicated that he could not recall having done so.

On rebuttal, however, Trooper Ottenbacher testified that he had prepared the written report and had recorded certain statements made by Knife. Although Ottenbacher did not repeat the exact words attributed to Knife, the implication was that Knife had in fact made the statement in question.

street. There is no basis in Knife's statement for inferring that he intended any greater harm to Huddleston.

Finally, the Government suggests that Knife's call for assistance over the CB radio located in the police patrol car was an attempt to attract additional law enforcement people to the scene of the ambush where they too would be the subject of an assault. This conclusion is speculative at best and, in any event, has little bearing on Knife and Iyotte's intentions with respect to Huddleston.

Aside from the fact that the statements attributed to Knife are inconclusive and ambiguous, Knife's behavior on the day in question appears to be inconsistent with the Government's theory of the case in significant respects. For example, given the uncontradicted testimony of Patrolman Huddleston that he did not as a rule proceed into the Indian housing area to make arrests, and given the testimony that this practice was known in the Indian community, it seems incongruous that Knife and Iyotte would have concocted a scheme to assault Huddleston that depended for its success on drawing him onto Indian property. It is similarly unclear why Knife and Iyotte would have expected Huddleston to appear on the scene once it became apparent that Deputy Sheriff Hill's call for help had been answered by Trooper Halverson. In addition, if, as the Government implied, Knife actually saw Huddleston earlier in the day servicing his car across from the Indian housing area, it seems strange that he did not avail himself of the opportunity to assault Huddleston then rather than go to the trouble of formulating an elaborate ambush. Finally, if in fact Knife intended the assault on Huddleston, it is difficult to believe he would not in some manner—whether verbally or physically—have assist-

ed or encouraged Leroy Iyotte to attack Huddleston.

While the evidence produced at trial does not flatly contradict the Government's theory of the case, it is not, we think, sufficiently compelling or persuasive to permit a finding that defendant Knife was guilty beyond a reasonable doubt. Considered as a whole, the evidence of guilt in the instant case as it pertains to Knife appears to us to be so tenuous as to amount to mere speculation. Because the verdict is thus conjectural, it must be set aside. *See Wood v. United States*, 342 F.2d 708 (8th Cir. 1965).

■ The Government's case against Leroy Iyotte is considerably stronger than that against James Knife. There was clear evidence that Iyotte was upset at Huddleston's presence on Indian property and that tempers were short and emotions high at the time of the shooting. There was also evidence that Leroy Iyotte threatened Patrolman Huddleston, first ordering him off Indian land and when Huddleston refused to leave, jamming the muzzle of the shotgun into Huddleston's jaw leaving a scar. Given this situation, we cannot say that there was insufficient evidence to enable a jury reasonably to conclude that Iyotte possessed the requisite intent to assault at the time the gun went off and thus to sustain the verdict.

Defendant Iyotte, however, asserts as an alternative ground for reversal that he was so prejudiced by a joint trial as to require severance.[6] Defendants Knife and Iyotte were joined pursuant to Fed.R.Crim.P. 8[7] and the propriety of the initial joinder has not been challenged. Defendant Iyotte, however, contends that although the initial joinder was proper, prejudice resulted therefrom during the course of the trial, mandating a severance under Fed.R.Crim.P. 14.[8]

---

6. Counsel for Iyotte made an initial motion for severance prior to trial. That motion was denied, as were similar motions made several times during the course of the trial.

7. Rule 8(b) of the Federal Rules of Criminal Procedure provides in pertinent part:

 Two or more defendants may be charged in the same indictment or information if they

are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. . . .

8. Rule 14 of the Federal Rules of Criminal Procedure states that:

 If it appears that a defendant or the Government is prejudiced by a joinder of offenses or

Specifically, defendant Iyotte submits that he was prejudiced by the fact that the Government at trial called approximately a dozen witnesses to testify as to the disorderly conduct of codefendant Knife prior to the alleged assault. The purpose of this testimony was obviously to buttress the Government's theory that defendants Knife and Iyotte had gone downtown with the intention of creating a disturbance on main street so as to bait Huddleston and lead him into the Indian housing area where they could assault him. Defendant Iyotte submits that the actions of Knife would have been inadmissible as to him if he had been tried separately. Furthermore, according to Iyotte, the evidence presented established that he did not himself engage in any disorderly conduct while on main street in White River. He thus contends that he was prejudiced by the testimony as to the conduct of James Knife. Further prejudice is alleged to have flowed from the prosecution's argument at trial that certain statements made by Knife after his arrest established that both Knife and Iyotte had a preconceived plan to murder or assault Huddleston. Again, defendant Iyotte contends that in a separate trial the statements of Knife would have been inadmissible hearsay as to him.

A motion to sever under Rule 14 of the Federal Rules of Criminal Procedure is addressed to the sound discretion of the trial court. *United States v. Martinez,* 573 F.2d 529, 532–33 (8th Cir. 1978); *United States v. Anthony,* 565 F.2d 533, 538 (8th Cir. 1977); *United States v. Jackson,* 549 F.2d 517, 523 (8th Cir.), *cert. denied,* 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977). A denial of severance is not grounds for reversal unless clear prejudice

and an abuse of discretion are shown. *United States v. Jackson, supra* at 523; *Johnson v. United States,* 356 F.2d 680, 682 (8th Cir.), *cert. denied,* 385 U.S. 857, 87 S.Ct. 105, 17 L.Ed.2d 84 (1966). To establish grounds for reversal, a defendant must show something more than the mere fact that his chances for acquittal would have been better had he been tried separately. *Williams v. United States,* 416 F.2d 1064, 1070 (8th Cir. 1969). He must "affirmatively demonstrate that the joint trial prejudiced [his] right to a fair trial." *Golliher v. United States,* 362 F.2d 594, 603 (8th Cir. 1966).

In applying these general principles, this Court has recognized that the fact that evidence may be admissible as to one defendant but not as to another does not alone require that the defendants be given separate trials. *Caton v. United States,* 407 F.2d 367, 372 (8th Cir.), *cert. denied,* 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). Nor is a defendant entitled to severance simply because the evidence against a codefendant may be more damaging than the evidence against him. *United States v. Jackson, supra* at 525; *United States v. De Larosa,* 450 F.2d 1057, 1065 (3d Cir. 1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 800 (1972). Severance is required only where the proof is such that a jury could not reasonably be expected to compartmentalize the evidence as it relates to separate defendants. *United States v. De Larosa, supra* at 1065.

In this case the trial judge instructed the jurors at the trial's conclusion to consider the case against each defendant separately.[9] Moreover, the evidence

---

of defendants in an indictment or information or by such joinder for trial together, the Court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

. . .

**9.** The trial court instructed the jury as follows:

It is your duty to give separate, personal consideration to the case of each individual defendant. When you do so, you should ana-

lyze what the evidence in the case shows with respect to that individual, leaving out of consideration entirely any evidence admitted solely against the other defendant. Each defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct, and any other evidence in the case which may be applicable to him.

If the jury has a reasonable doubt as to the guilt of one defendant but not as to another,

against the two defendants was in general sufficiently separable to have permitted the jurors to separately evaluate the case against each defendant. We agree with defendant Iyotte, however, that the trial court erred in failing, at a minimum, to give a specific cautionary instruction contemporaneous with the admission into evidence of two statements crucial to the Government's theory of the case which were reportedly made by defendant Knife after his arrest and which constituted inadmissible hearsay as to Iyotte. The two statements have been referred to previously. The first was defendant Knife's statement to the effect that tensions were high in the Indian community because an Indian had died in the city jail and the Indian community blamed Huddleston for the death. The second was Knife's statement to Trooper Ottenbacher that "you didn't think we'd just let him off for killing one of our friends in the jail the other night, did you?" [10] Because these statements suggested a motive for the assault on Huddleston, they were arguably incriminating as to the defendant Iyotte. However, the United States Supreme Court has indicated that the harmless error rule applies to the erroneous use of an incriminating statement constituting hearsay. *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). In the instant case, when all the evidence is considered, we do not believe that the admission into evidence of these two statements was so prejudicial to Iyotte as to warrant a reversal of his conviction.[11]

Defendant Iyotte maintains that these statements were absolutely essential in establishing the intent necessary to convict him of assault under 18 U.S.C. §§ 113(d) and 113(f). In so contending, defendant misconstrues the statutory provisions in question as applied to the facts of this case. In the instant case, the evidence is clear that as soon as Iyotte saw Patrolman Huddleston, he forced the officer into the city patrol car at the point of a shotgun. Iyotte then stood by the open door of the car,

---

it must acquit the one and may convict the other.

10. Arguably both statements constitute admissions of defendant Knife and as such were admissible as to him. Under the coconspirator exception to the hearsay rule, moreover, admissions of one conspirator made "during the course and in the furtherance of the conspiracy" may be admitted into evidence against a coconspirator. Fed.R.Evid. 801(d)(2)(E). However, the coconspirator exception would not apply in the instant case to justify the admission against defendant Iyotte of the statements made by defendant Knife since both statements were made after any "conspiracy" or scheme to assault Patrolman Huddleston had come to an end. *See generally* McCormick on Evidence (2d ed. 1972) § 267.

There appears no other basis for admitting the statements into evidence against Iyotte. Prior to the effective date of the Federal Rules of Evidence, the statement of defendant Knife allegedly made to Trooper Ottenbacher at the scene of the shooting might have been admissible as part of the res gestae. The Federal Rules, however, restrict considerably the circumstances in which such statements, which are otherwise hearsay, may be admitted into evidence. While the statement in question might at first glance appear to fall within the excited utterance exception to the Federal Rules (see Rule 803(2)), that exception has been construed to apply only when a statement is spontaneous and not the product of reflective thought. McCormick on Evidence, *supra* at § 297. The hallmark of the exception is the requirement that there be an event so startling as to suspend the declarant's powers of reflection and, presumably, his powers of fabrication as well. *See generally* 6 Wigmore, Evidence § 1747. At the outset, if one were to accept the Government's theory of the instant case, it would be difficult to believe that the preplanned shooting of Patrolman Huddleston was an event so startling or unexpected as to suspend the defendant declarant's powers of reflection. After all, according to the Government, the defendants had contemplated and anticipated the shooting for some time. Beyond this, however, the comment by its very nature constitutes a reflection on the part of the declarant concerning the relationship between the shooting of Patrolman Huddleston and an incident that occurred several days earlier at the White River jail. As such, the statement does not properly fall within the excited utterance exception.

11. It appears that the jury in fact discounted Knife's two statements as evidence of Iyotte's possible motive or participation in a preconceived plan since they concluded that Iyotte had not acted with specific intent to commit murder, 18 U.S.C. § 113(a), as originally charged in Count I.

waved the shotgun within a few inches of Huddleston's face and demanded that the officer turn over his weapons and leave. When Huddleston refused to do so, and within the course of a few minutes, Iyotte struck Huddleston's face with the muzzle of the shotgun with such force that a scar was visible months later, rammed the gun into Huddleston's stomach, pulled the gun back and discharged it point-blank into the officer's side. Huddleston testified further that after Iyotte shot him, the defendant turned around to face Officer Halverson who was still struggling with Knife and two others. As Huddleston crawled out of his patrol car on the passenger side, he heard Iyotte yell to the men around Halverson, "Everybody get away from him. I want to kill that son of a bitch, too."

We believe this sequence of events is clearly sufficient to constitute an assault within the meaning of 18 U.S.C. §§ 113(d) and 113(f), independent of any consideration of the two statements attributed to defendant Knife. On Count I of the indictment, Iyotte was convicted of assault by striking, beating or wounding, 18 U.S.C. § 113(d), as a lesser included offense of 18 U.S.C. § 113(a). Section 113(d) is the equivalent of simple battery and "requires neither a particular degree of severity in the injury nor that type of specific intent which characterizes the more serious offenses under Section 113." *United States v. Stewart*, 568 F.2d 501, 504–05 (6th Cir. 1978). *Accord, United States v. Martin*, 536 F.2d 535 (2d Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 167, 50 L.Ed.2d 141 (1976). This offense was complete when Iyotte drove the shotgun into Huddleston's face and stomach.

The two out-of-court statements made by defendant Knife bear directly and importantly on the Government's theory that Knife and Iyotte preplanned the attack on Huddleston, intentionally luring the officer to the Indian housing area for that

purpose. However, such preconceived plan is not an essential element of assault resulting in serious bodily injury, 18 U.S.C. § 113(f), the second charge on which Iyotte was convicted. Nor is specific intent to cause serious injury required by that section.

Section 113(f) requires only that the assault shall have resulted in serious bodily harm; the assault need not have been committed with a dangerous weapon, or with intent to do bodily harm. *United States v. Eagle*, 586 F.2d 1193 at 1196 (8th Cir., 1978).

The element of intent in § 113(f) is satisfied if the general intent to commit the acts of assault arose when Iyotte initially approached Huddleston. At that point, in one continuous transaction Iyotte committed a series of increasingly severe attacks on the officer.[12] The fact that Huddleston received serious injuries is uncontroverted. Because the introduction of Knife's statements was not essential to establish the requisite intent necessary to convict Iyotte of assault, we do not believe the record reflects the kind of clear prejudice and abuse of discretion required to reverse a conviction on grounds of refusal to grant a severance under Fed.R.Crim.P. 14. *United States v. Jackson, supra* at 523–25.

The remaining issues raised by defendant Iyotte on appeal are similarly, we believe, without merit and need not detain us long. Prior to trial defendant Iyotte moved the trial court for an order compelling the Government to elect one count of the two count indictment in its prosecution. Defendant now contends that the denial of that motion was reversible error since the two count indictment created a multiplicity of charges for a single offense, thus prejudicing defendant in the eyes of the jury by suggesting that he had committed not one but several crimes.

The basic test for multiplicity in an indictment has been stated by the Supreme

---

12. When he forced the officer into the patrol car at the point of a shotgun and waved the gun in the officer's face, Iyotte committed the offense of simple assault set forth in 18 U.S.C. § 113(e). Within seconds, he then committed the assault, and assault resulting in serious bodily injury with which he was charged under 18 U.S.C. §§ 113(d) and 113(f).

Court in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), as follows:

> The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.

The statutory violations defined in 18 U.S.C. § 113(a) and § 113(f) require different elements of proof; thus the offenses charged are different as a matter of law. Under 18 U.S.C. § 113(a), referring to assault with intent to commit murder, no physical harm need result but a specific intent to commit murder must be shown. By contrast, the essential element of the offenses charged under 18 U.S.C. § 113(f) is that serious bodily injury result. No specific intent to cause such injury need be shown. We think thus defined the offenses are sufficiently different to avoid charges of multiplicity in the instant case.[13]

 The final contention raised by defendant Iyotte on appeal is that the trial court erred in denying his motion to suppress a statement made to an investigating FBI agent while Iyotte was in the hospital recuperating from gunshot wounds. In the statement, used by the Government for impeachment at trial, Iyotte denied having participated in the shooting of Ted Huddleston. Iyotte contends that the statement should have been suppressed as involuntary or not freely given because made while he was in intense pain and under the influence of drugs.[14]

At a suppression hearing held outside the presence of the jury, the Government called Agent Davis of the FBI, Iyotte's treating physician and a nurse who had attended Iyotte on the day in question. Based upon this testimony, the trial court denied the motion to suppress and made a specific finding of voluntariness:

> This Court finds that [the] statement given to the FBI while Mr. Iyotte was in the hospital on October 18, 1977, was given without coercion or undue influence, and that the statement was freely and voluntarily given by Leroy Iyotte after he had been fully advised of his constitutional rights. This Court further finds that he was alert, articulate, knew where he was and knew who he was talking to, and he was not under the influence of drugs to such an extent that he was unaware of what he was saying or unaware as to the subject he was talking about . . ..

We find no basis in the record for challenging the correctness of the trial court's findings. Moreover, we believe the circumstances surrounding Iyotte's interrogation are readily distinguishable from the circumstances which led the Supreme Court in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), to hold that petitioner's statements taken from a hospital bed were involuntary and therefore not constitutionally admissible at trial.[15] Be-

---

**13.** Evidence that Congress intended the offense defined in 18 U.S.C. § 113(f) to be treated as separate and distinct from that defined in 18 U.S.C. § 113(a) is contained in the legislative history behind the enactment of paragraph (f) in 1976. Section 113, as enacted in 1948, did not provide for assault resulting in serious bodily injury. In referring to subsection (f) the House Committee Report states:

> Section 3 of the bill amends 18 U.S.C. § 113 by adding a new subsection defining and prescribing punishment for the offense of assault resulting in serious bodily injury. This is necessary because § 113, which defines Federal assault offenses, does not presently contain this offense. Since this offense is one of the enumerated offenses in § 1153 that

is to be defined and punished in accordance with Federal law, this amendment to § 113 is necessary to give substance to the inclusion of this offense in § 1153. 1976 U.S.Code Cong. & Admin.News, pp. 1125, 1129–30.

**14.** Iyotte was given a full *Miranda* warning by FBI Agent Davis prior to being questioned and does not contend that there was any failure to advise him of his constitutional rights.

**15.** In *Mincey*, the interrogation occurred within hours after petitioner's hospitalization, while petitioner was heavily sedated and obviously distracted by pain. Moreover, the interrogating police officer in *Mincey* ignored petitioner's repeated requests for assistance of counsel and continued the interrogation despite the fact

cause the statements made by defendant Iyotte were freely and voluntarily made, use of these statements did not deprive defendant of due process of law.

In conclusion, having examined each of the issues presented by defendants Knife and Iyotte on appeal, and based upon the foregoing analysis we affirm as to defendant Iyotte. As to defendant Knife, we reverse and remand with instructions to enter a judgment of acquittal.

that the answers Mincey gave were unresponsive and uninformative and despite Mincey's complaint on several occasions that he was confused and unable to think clearly.