UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas N. MOORE,
Defendant-Appellant.

No. 85–2758.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1986.

Decided May 23, 1986.

James P. Chapman, Chicago, Ill., for defendant-appellant.

Michael J. Shepard, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, POSNER and EASTERBROOK, Circuit Judges.

CUDAHY, Circuit Judge.

Defendant Thomas Moore, Purchasing Agent for the Metropolitan Sanitary District of Greater Chicago (the "District"), was found guilty of mail fraud for rigging a bid for construction work. The trial court denied defendant's motion for arrest of judgment or in the alternative for a new trial. Defendant appeals, alleging that the district court committed various evidentiary errors and improperly excused a juror. We affirm.

## I

The facts, viewed in the light most favorable to the verdict, establish the following sequence of events. The District is generally required to award contracts for construction work by a process of sealed bidding. The bidders submit bid books in sealed envelopes. Each bid book contains a price sheet stating the price at which the bidder is willing to perform the contract. Obviously each bid book should contain only one price sheet. The sealed bids are then opened by the Purchasing Agent for the District at the designated time, read aloud and the contract is awarded to the lowest bidder. The bids are supposed to be read in the order in which they were received.

During the summer and fall of 1979, defendant met several times with Harold Middleton, Vice President of S.A. Healy Company. Healy performed a large amount of construction work for the District. During one of these meetings defendant proposed a scheme under which

Middleton could be guaranteed to receive a contract at a favorable price. Middleton would put several bid price sheets in a bid book. Defendant would read Middleton's bid last and would read only the highest bid that was still low enough to win the contract. Defendant would then dispose of the other bid sheets.

Middleton later proposed that defendant permit Gordon Roberts, owner of G. Roberts Material Company, to use the suggested scheme to bid on the Hazel Crest project in November 1979. This project was too small to interest Healy.

The scheme proceeded as planned and Roberts later paid defendant $10,000. Roberts' bid was read last, even though it was received first. Defendant, however, was not very careful in disposing of the extra bid sheets. Shortly after the bidding his secretary, Lois Marren, found the bid sheets in his wastebasket. Marren summoned her colleague Irene Marszalek into the defendant's office, showed her some torn sheets and said, "I've found the evidence I've been waiting for for a long time." Marren eventually took the sheets to defendant's boss, Hugh McMillan. Unfortunately Marren died before trial.

In March 1980 defendant was told that the bid sheets had been found. He resigned the same day. Defendant later met with Middleton and explained that the extra sheets had been found in his wastebasket. When Middleton told defendant that Middleton and Roberts would not tell what they knew, defendant commented that his resignation had been hasty. As sometimes occurs in such circumstances, Middleton and Roberts testified against defendant at trial in exchange for immunity.

On appeal defendant challenges the admission of Marren's statements to Marszalek into evidence as excited utterances. Defendant also challenges the admission of a bid tabulation sheet, prepared by an employee of the District who died before trial, as a business record to show the order in which the bids were actually read. In addition, the defendant argues that the government's cross-examination of him was improper in several respects. Finally, defendant challenges the excusal of a juror who overheard the judge discussing the case with his law clerk.

II

The trial court has broad discretion to assess the admissibility of proffered evidence, and we may reverse its rulings on appeal only when the trial court abused its discretion. *See United States v. Davis*, 772 F.2d 1339, 1343 (7th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 603, 88 L.Ed.2d 581 (1985); *United States v. Harris*, 761 F.2d 394, 398 (7th Cir.1985); *United States v. Latham*, 754 F.2d 747, 751 (7th Cir.1985).

The district court admitted testimony of Marren's statements as an excited utterance under Federal Rule of Evidence 803(2). Rule 803 allows hearsay testimony of "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed.R.Evid. 803(2). This exception may be applied only if each of three conditions is met: 1) a startling event or condition occurred; 2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and 3) the statement relates to the startling event or condition. *See David v. Pueblo Supermarket*, 740 F.2d 230, 235 (3d Cir.1984) (requiring "(1) a startling occasion, (2) a statement made before time to fabricate, and (3) the statement relates to the circumstances of the occurrence"); 4 Weinstein's Evidence ¶ 803(2)[01] (1985). Defendant argues that none of these conditions have been met. We shall address each of these conditions in turn.

The appearance, behavior and condition of the declarant may establish that a startling event occurred.[1] *See, e.g.,*

---

1. Defendant argues that the fact that the declarant appears and behaves as if she were excited cannot by itself establish that a startling event occurred. Defendant is correct that there must be a startling event and a statement made by a person while under the stress of excitement, and

*Wetherbee v. Safety Casualty Co.*, 219 F.2d 274 (5th Cir.1955); *Wheeler v. United States*, 211 F.2d 19 (D.C.Cir.1953), *cert. denied*, 347 U.S. 1019, 74 S.Ct. 876, 98 L.Ed. 1140 (1954); Notes of Advisory Committee on Proposed Rules (hereinafter "Committee Notes"); Louisell, 4 Federal Evidence 510–11 (1980); 4 Weinstein's Evidence ¶ 803(2)[01] at 803–87 & n. 10 (1985). Further, the declaration itself may establish that a startling event occurred. *See* Committee Notes; McCormick on Evidence 705 & n. 24 (2d ed. 1972); 4 Weinstein's Evidence ¶ 803(2)[01] at 803–87 to 88 (1985).

■ In the case before us Marszalek offered testimony that Marren's appearance and behavior indicated that a startling event had occurred. Marszalek testified that Marren was not normally an excitable person and she had never before seen her so excited. Tr. at 246. She repeatedly stated that Marren was very excited, "just like jumping up and down." Tr. at 246; *see also* Tr. at 248, 249. Marren was flushed. Tr. at 249. She was talking "[a]s if she had won a million dollars in a lottery." Tr. at 249. Of course, Marren's statement itself may indicate that a startling event occurred. Marren told Marszalek that she finally found the evidence she had been looking for for a long time. Tr. at 245–46, 263. When one searches for something for a long time, perhaps not knowing if it will ever be found, one may reasonably expect to be excited when one finally finds it.[2] This is like panning for gold. Discovery may to one degree or another be expected; but it is always exciting.

■ Seeming to deny this, defendant argues that a startling event could not have occurred because Marren expected to find incriminating evidence in Moore's wastebasket and that is the reason she looked there. Defendant contends that this case is similar to *United States v. Knife*, 592 F.2d 472 (8th Cir.1979), in which the court stated in dicta that a defendant's statement made after a preplanned assault would be inadmissible as an excited utterance because "it would be difficult to believe that the preplanned shooting of Patrolman Huddleston was an event so startling or unexpected as to suspend the defendant declarant's powers of reflection." *Knife*, 592 F.2d at 481 n. 10.[3] *Knife*, however, is distinguishable. The statement in *Knife* assumes that the timing, location and circumstances of the event, a preplanned shooting of a policeman, were within the declarant's control. Here, Marren did not know when or where she would find the evidence she was looking for, or if she would ever find it. She obviously looked in the wastebasket on the particular day in question not because she was certain she would find the evidence, but because she thought she might find some evidence.

■ Further, the district court did not abuse its discretion in finding that the second requirement of the excited utterance exception, that the statement was made while the declarant was under the stress of excitement caused by the event, was met. Here the court must be able to determine

---

that these are two distinct requirements. However, defendant does not cite any authority for the proposition that the appearance and behavior of the declarant cannot be used to show that a startling event occurred.

**2.** Defendant argues that the startling event must be one that the trier of fact can objectively perceive as one, such as a sudden fall or an automobile accident. Although startling events are frequently totally unexpected happenings such as an accident or act of criminal conduct, they need not be, so long as the event actually has a startling impact on the declarant. *See United States v. Earley*, 657 F.2d 195, 197–98 (8th Cir.1981) (statement made after receiving telephone call); *United States v. Napier*, 518 F.2d 316 (9th Cir.) (statement made after looking at photograph), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); Binder, Hearsay Handbook § 2.07 (2d ed. 1983); McCormick on Evidence 705 (2d ed. 1972) ("The courts seem to look primarily to the effect upon the declarant and, if satisfied that the event was such as to cause adequate excitement, the inquiry is ended.").

**3.** The court in *Knife* held that the statement should not be admitted under the excited utterance exception because the statement was the product of reflective thought.

that the declarant's state at the time the declaration was made excluded the possibility of conscious reflection. *See* 4 Weinstein's Evidence ¶ 803(2)[01] at 803–91 & n. 25 (citing cases). The lapse of time between the startling event and the statement is relevant but not dispositive.[4] *See Gross v. Greer,* 773 F.2d 116, 119–20 (7th Cir.1985). Testimony that the declarant appeared excited when the statement was made and that there was a reasonable basis for this continuing excitement may be sufficient. *See* McCormick on Evidence 706 & n. 33 (2d ed. 1972). Although there is no direct evidence of the length of time between Marren's discovery of the papers and her statement to Marszalek, Marszalek's testimony indicates that it is unlikely that a significant amount of time elapsed. She testified that Marren made her statement *"[r]ight after bid opening,* around noontime." Tr. at 245 (emphasis supplied). She also testified that the bids were not read until after eleven, and that it took *at least* twenty to thirty minutes to read them. Tr. at 267, 274. The defendant himself testified that bid openings usually took thirty to forty-five minutes. Tr. at 481. After that, Moore would have had to return to his office and dispose of the bid sheets. Marren would have had to wait until he left his office before she could search it. Thus the district court did not abuse its discretion in finding that the statement was made under the stress of excitement caused by the startling event, especially in light of Marszalek's testimony that Marren was very excited when she made the statement.

▊ The district court also was entitled to find that the statement related to the startling event. The excited utterance exception allows a broader scope of subject matter coverage than does the present sense impression exception, which limits the subject matter of the statement to a description or explanation of the event. *See* Committee Notes; Louisell, 4 Federal Evidence 513 (1980). Weinstein suggests a rule of thumb: "If the subject matter of the statement is such as would likely be evoked by the event, the statement should be admitted." 4 Weinstein's Evidence ¶ 803(2)[01] at 803–95 (1985). However, the fact that a statement goes beyond a mere description of the event may be considered in deciding whether the statement is sufficiently related to the event to be spontaneous, or whether it was the product of conscious reflection. *See Murphy Auto Parts Co. v. Ball,* 249 F.2d 508, 511–12 (D.C.Cir. 1957), *cert. denied,* 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958).

Defendant argues that Marren's statements "show her mentally 'connecting-up' the supposed startling event with something which preceded the event," and that this indicates conscious reflection. Defendant's Brief at 31. However, the caselaw indicates that even statements that refer to prior events or thoughts may be admissible as excited utterances. *See, e.g., David v. Pueblo Supermarket,* 740 F.2d 230, 234 (3d Cir.1984) (statement in a slip and fall case that "I told them to clean it up about two hours ago"); *Murphy Auto Parts Co. v. Ball,* 249 F.2d 508 (D.C.Cir.1957), *cert. denied,* 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958) (statement after automobile accident that declarant had had to call on a customer and was in a hurry to get home); *Sanitary Grocery Co. v. Snead,* 90 F.2d 374 (D.C.Cir.) (after a customer slipped and fell clerk stated, "that has been on the floor for a couple hours"), *cert. denied,* 302 U.S. 703, 58 S.Ct. 22, 82 L.Ed. 543 (1937).

---

**4.** Although defendant does not raise the issue, we think it appropriate to clarify and refine our holding in *Pfeil v. Rogers,* 757 F.2d 850 (7th Cir.1985). In *Pfeil* we stated that "both the present sense impression and excited utterance exceptions require that the statement be made contemporaneously with the event that prompted them." *Pfeil,* 757 F.2d at 861. It may be more precise in the present context to state that the present sense impression exception requires that the statement be made contemporaneously, or almost contemporaneously, with the event that prompted it. The excited utterance exception, on the other hand, requires only that the statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself. *See* Committee Notes; McCormick on Evidence 706 (2d ed. 1972); 4 Weinstein's Evidence ¶ 803(2)[01] at 803–90 to 91 (1985).

We do not think that Marren's statement is likely to have indicated conscious reflection, especially given the evidence of her excitement. In any event, the district court did not abuse its discretion. *Cf. Murphy Auto Parts,* 249 F.2d at 511 (evaluation of spontaneity of statement "lies essentially with the trial court").

Thus the district court did not abuse its discretion in finding that Marren's statement met the three requirements for admissibility. Defendant, however, makes several additional arguments: 1) that the denial of the government's motion to admit some of Marren's statements under Federal Rule of Evidence 804(b)(5) indicates that Marren's statements lack trustworthiness and thus that her statement to Marszalek should not be admitted as an excited utterance; 2) that Marren was biased against defendant and thus her statement should not be admitted as an excited utterance; 3) that the testimony should have been excluded because it was irrelevant; and 4) that the confrontation clause was violated by the admission of the statement.

In this connection the government sought to introduce some statements Marren had made to an assistant state's attorney. Marren had told the state's attorney that defendant had told her to call the Roberts' bid last and that she had found the torn bid sheets in his wastebasket. Because this hearsay did not fall within any of the established exceptions, the government sought to introduce it under 804(b)(5), the catchall provision in the Federal Rules of Evidence. The district court did not feel that the statements had sufficient "equivalent guarantees of trustworthiness," and thus did not admit the hearsay.

Of course, the district court's exclusion of some of Marren's statements under 804(b)(5) should not determine whether statements made by Marren at a different time, to a different person and under different circumstances should be admitted under 803(2). Rule 804(b)(5) was intended to be used rarely, and only in exceptional circumstances. *See Huff v. White Motor Corp.,* 609 F.2d 286, 291 (7th Cir.1979). Under 804(b)(5) the proponent of the hearsay statement must show that it has "equivalent circumstantial guarantees of trustworthiness" to statements admissible under the specific hearsay exceptions. *Id.* at 292–93. Under 803(2), on the other hand, the proponent of the testimony only need establish that the requirements of the rule are met. It need not independently establish circumstantial guarantees of trustworthiness because guarantees of trustworthiness are inherent in the rule. The theory of 803(2) is that the condition of excitement "temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." Committee Notes.

Similarly, bias on the part of Marren does not necessarily make her statement inadmissible. Defendant does not cite any authority for rejecting an otherwise admissible statement because of the declarant's bias.[5] The victim of a crime may harbor a bias against the perpetrator, yet courts typically allow the victim's excited utterance to be admitted into evidence. We do not suggest that a declarant's bias can never be a factor in determining whether a statement qualifies as an excited utterance. Rather, we merely believe that the district court did not abuse its discretion in admitting Marren's statement, even though

---

5. Defendant quotes some dicta in *Miller v. Keating,* 754 F.2d 507, 511–12 (3d Cir.1985) that states:

> And the tenor of the declaration, i.e. "the bastard tried to cut in," suggests at least the possibility that the declarant was a participant with a natural degree of bias. The self-serving exclamation by a participant in an auto accident "it was the other guy's fault," is hardly likely to qualify as trustworthy.

A fair reading of *Miller* reveals, however, that the court did not rely on any hypothetical bias of the declarant in excluding the statement. (Indeed the court could not have determined whether the declarant was biased because the declarant was unidentified.) Rather, the court excluded the statement because the declarant was unidentified and thus it could not be determined whether he had seen the accident and been excited by it.

she may have been looking for evidence against the defendant.

██ Defendant's next argument is that Marren's statement was irrelevant because there was no relationship between the sheets Marszalek saw in November 1979 and the sheets Marren gave McMillan in March 1980. A trial court's determination of relevancy will be reversed only if there is a clear abuse of discretion. *United States v. Bressler*, 772 F.2d 287, 292 n. 3 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986). Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. The fact that different inferences may be drawn from the evidence does not make it irrelevant. *Public Service Co. of Indiana v. Bath Iron Works*, 773 F.2d 783, 791 (7th Cir.1985). Marszalek's testimony was relevant to show that the bid sheets introduced into evidence were found in defendant's wastebasket. Although Marszalek did not know whether the sheets she saw were the bid sheets introduced into evidence, the jury could reasonably draw this inference. First, Marszalek saw the sheets in the wastebasket the day of the bid and Marren's statement indicated that the sheets implicated defendant in some way. Of course, the bid sheets in question would implicate the defendant. Second, Marren later turned over bid sheets to McMillan. Third, Middleton testified that the defendant admitted to him that the bid sheets in question were found in his wastebasket. Tr. at 85.

██ Defendant's final argument regarding Marren's statement is that it violated defendant's sixth amendment rights to confront and cross-examine witnesses against him. A hearsay statement does not violate the confrontation clause if the declarant is unavailable and the statement bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* Here Marren was obviously unavailable. The excited utterance exception is a firmly rooted hearsay exception.[6] *See Haggins v. Warden, Fort Pillow State Farm*, 715 F.2d 1050, 1056–58 (6th Cir.1983), *cert. denied,* 464 U.S. 1071, 104 S.Ct. 980, 79 L.Ed.2d 217 (1984); *McLaughlin v. Vinzant*, 522 F.2d 448, 450 (1st Cir.), *cert. denied,* 423 U.S. 1037, 96 S.Ct. 573, 46 L.Ed.2d 412 (1975); *see also United States v. Cree*, 778 F.2d 474, 502 (8th Cir.1985) (dissent).

## III

Defendant's second argument is that the admission into evidence of a bid tabulation sheet prepared by Goldman and Kasprak's explanatory testimony to show the order in which the bids were read amounted to prejudicial error. Defendant argues that because Kasprak did not personally observe the creation of the bid tabulation sheet, she was not qualified to say whether Goldman filled out the record at the bid opening and whether he recorded the bids in the order in which they were read.

██ Rule 803(6) requires that a "custodian or qualified witness" testify that the various requirements of the business records exception are met. There is no requirement, however, that a "qualified witness" must have personally participated in or observed the creation of the document. *See United States v. Keplinger*, 776 F.2d 678, 693 (7th Cir.1985). The phrase "qualified witness" is to be broadly

---

6. In addition, we think that there are sufficient "particularized guarantees of trustworthiness" in this case. *See Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980). Marren clearly appeared excited and her statement does not appear to be the product of conscious reflection. Further, her statements were corroborated by the defendant's admission that the bid sheets were found in his wastebasket and by the fact that the bid sheets Marren gave to McMillan were in fact the extra bid sheets placed in the bid book by Middleton. All these matters "hang together."

interpreted as requiring only someone who understands the system. *Id.* at 694. Kasprak's testimony was more than sufficient to establish that Goldman filled out bid tabulation sheets only at bid openings and that he recorded the bids in the order in which they were read.[7] The district court did not abuse its discretion in admitting this evidence.

## IV

Defendant's third argument is that the government asked Moore improper questions during his cross-examination.

■ First, defendant objects to the government's questions about carpentry work that the Healy Company did on Moore's residence. Defendant argues that these questions were designed to show Moore's propensity for immoral conduct. Moore had testified that he had only a casual business relationship with Middleton. The court permitted the questions to show that Moore had more than a casual business relationship with Middleton. Tr. at 508. In fact, in its closing argument the government used the testimony exactly for that proper purpose—to show that, contrary to defendant's testimony, he had more than a casual business relationship with Middleton. *See* Defendant's Brief at 41. We do not think that the district court abused its discretion in determining that the probative value of the evidence here was not outweighed by the danger of unfair prejudice. Clearly it is more difficult to believe Middleton's testimony that defendant suggested a method of rigging bids to him if one were to believe that there was only a casual business relationship between them. Thus the evidence in question had substantial probative value. Any prejudicial effect was minimized to the extent that the district court sustained every one of defendant's objections to particular questions by the government in pursuing this line of inquiry.

■ Second, defendant objects to the government's questions about whether defendant resigned on the same day that he found out that the bid sheets had been discovered. Tr. at 520. This testimony was permitted because it corroborated Middleton's testimony that Moore had later told him: "I have resigned from the district. I was too hasty in doing it. I wouldn't have resigned if I knew that you and Roberts were not going to tell the truth." Tr. at 299; *see* Tr. at 522. Defendant argues that permitting this testimony conflicted with a previous ruling by the district court. In that instance the court held that McMillan could not testify that, when he confronted defendant with the bid sheets, the defendant said "Well, I guess that's all there is to it" and then resigned, because the latter statement did not constitute an admission. Tr. at 320–21. The district court did not see any conflict between its two rulings, nor do we. Tr. at 523. Nor do we think that the district court was required to conclude that the prejudicial value of the evidence on the resignation (that the jury might take defendant's resignation as an admission of guilt) substantially outweighed its probative value. On redirect the defendant explained that he resigned because he thought that he would lose his pension if McMillan fired him. Tr. at 540.

■ Third, defendant argues that the government improperly asked defendant several questions that implied that defendant had seen the remains from torn out pages in the bid book when there was no reason to believe there was a factual foundation for this assumption. Tr. at 519. We do not think that these questions

---

7. The fact that the bid tabulation sheet in issue failed to list the names of two of the three bidders does not necessarily contradict Kasprak's testimony that she relied upon the order in which the bidders were listed in the bid tabulation sheet to answer questions about the bidding. The particular bids listed on the sheet uniquely identify the bidders and the names of the bidders were written on tabs (on which Goldman had checked the computations of the bidders) attached to the sheet. Objections that an exhibit obtains omissions generally go to the weight of the evidence not its admissibility. *See United States v. Keplinger,* 776 F.2d 678, 694 (7th Cir.1985).

amount to reversible error. Defendant had just finished testifying that there was only a single bid in the bid book when he opened it. If this were true, one could infer that the extra pages must have been torn out earlier and that there would have been some remnants in the bid book. The government's questions were designed to show that defendant did not report the existence of remnants to anyone. Further, defendant could have objected to these questions on the ground that there was no foundation. Tr. at 534. But the defendant did not object to the questions when they were asked nor did the defendant accept the judge's offer that he return to the stand to testify whether or not there were remnants of torn pages in the bid book.

■ Fourth, defendant argues that the government's use of hypothetical questions was improper and constitutes reversible error. The government set forth the following hypothetical: "A scheme is developed where a bidder will submit multiple bid pages on a contract of the sanitary district. The person reading the bids will read one of those pages that is below the competitor's bid, but is the highest of the bids in that book." Tr. at 500. Through its questions the government elicited how such a scheme would work. Defendant argues that the questions destroyed his presumption of innocence.[8] The district court, however, has the discretion to permit hypothetical questions. *See United States v. Ranney*, 719 F.2d 1183, 1187–88 (1st Cir.1983).[9] After examining the transcript, we conclude that the district court did not abuse its discretion in permitting these questions.

■ Fifth, defendant claims he was prejudiced by two questions asking him whether he had learned to "wheel and deal" in the quartermaster corps. The court sustained defendant's objections to these questions and instructed the jury not to consider them as "any implication of anything done wrong by Mr. Moore." Tr. at 495. This instruction was sufficient to correct any prejudice.

## V

■ Defendant's fourth argument is that the district court improperly excused a juror. Two jurors were in the judge's office making phone calls while the judge was discussing the case with one of his law clerks. After discussing the situation with the two attorneys, the judge asked if any juror had heard anything that the judge had said while the jurors were in his office. Juror Mary Kazecki admitted that she had heard something. The judge, the attorneys and Kazecki then discussed in chambers what she had heard. She said that she had heard the judge say something about the sheets. The judge asked if counsel had any questions to ask her; neither attorney wanted to question her further. At that point the judge said "what we are going to do then is excuse you." The judge and the attorneys continued to discuss the matter after Kazecki left the room. Counsel for defendant moved for a mistrial. After some discussion, the judge asked defendant's counsel whether, assuming the motion for a mistrial were denied, he would prefer to ask Kazecki if she could totally disregard anything she heard and, if she said yes, to leave her on the jury or whether he preferred simply to excuse her. Defendant's counsel expressed no preference so the judge excused the juror.

Defendant argues that Kazecki was improperly excused without determining her ability to be fair and impartial. He argues

---

**8.** Defendant also argues that the hypothetical questions were confusing because it was difficult to determine where the hypothetical began and ended. Our examination of the transcript, however, reveals no such confusion.

**9.** The cases cited by defendant are distinguishable because they involve hypothetical questions asked of character witnesses. *See United States v. Williams*, 738 F.2d 172, 177 (7th Cir.1984);

*United States v. Candelaria-Gonzalez*, 547 F.2d 291 (5th Cir.1977). Cross examination of character witnesses is strictly limited by the Federal Rules of Evidence. *See* Fed.R.Evid. 405(a). In the case before us defendant was not asked to draw speculative conclusions based upon facts that assumed his guilt. Rather, he was asked questions that he could answer based on his knowledge of the bidding process.

that after counsel said they had no questions, the judge excused her without further warning. It is unclear whether the judge's statement at that point meant that the juror was excused from the case or only from the room. In any event, defendant's argument entirely ignores the subsequent conversation. The defendant's counsel was offered the opportunity to question Kazecki further about her possible partiality, and if appropriate, to keep her on the jury. He, however, did not express a preference for this option. Nor did he avail himself of the opportunity to question her while she was in the room about her ability to be impartial. Defendant has thus waived any right to argue that Kazecki should not have been excused. Defendant cannot fail to express a preference at the appropriate time and then later argue that an error was committed.

For all these reasons, the judgment is AFFIRMED.