**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony Richard RANDOLPH, Jr., Defendant–Appellant.**

**No. 95–30137.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 8, 1996.

Decided Aug. 22, 1996.

---

Ellen C. Pitcher, Assistant Federal Public Defender, Portland, Oregon, for defendant-appellant.

Fred N. Weinhouse, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellee.

Before: JOHN T. NOONAN, Jr., LEAVY and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

This appeal asks us to consider the quantum of evidence necessary to establish the intent element recently added by Congress to the federal carjacking statute, 18 U.S.C. § 2119, namely, that a defendant possess the "intent to cause death or serious bodily harm[.]" 18 U.S.C. § 2119. Defendant Anthony Richard Randolph, Jr. challenges the sufficiency of evidence underlying his conviction for carjacking in violation of 18 U.S.C. §§ 2119 and 2. Additionally, he challenges § 2119's validity under the Commerce Clause of the Constitution as well as the district court's enhancement of his sentence for seri-

ous physical injury under U.S.S.G. § 2B3.1(B)(3)(b).

We have jurisdiction pursuant to 28 U.S.C. § 1291. We vacate Randolph's conviction because we conclude the government failed to muster sufficient evidence to establish that Randolph acted "with the intent to cause death or serious bodily harm."

## FACTUAL AND PROCEDURAL HISTORY

The events surrounding Randolph's indictment are largely undisputed. Randolph admits that he took the victim's car and money at gunpoint and forced her to drive several miles before releasing her unharmed. He insists, however, that he had no intent to kill or to harm the victim, and did not know that his associates would later assault her. The central issue at Randolph's bench trial[1] is also the central issue in this appeal: whether Randolph acted with the requisite "intent to cause death or serious bodily harm." 18 U.S.C. § 2119.

Late in the evening of October 4, 1994, Randolph and three friends, Michael Duane Sweere, Jeff Cooper, and Cricket Henry, gathered at the home of a fifth friend, Justin Bond. Sometime between 10:30 p.m. and the following morning, all five took LSD and methamphetamine. Early the next morning, apparently at the suggestion of Bond and Randolph, the five got into a Jeep Sweere had purloined from the car dealership where he worked, and headed out, as Sweere later testified, "to get some money."

At 5:30 that same morning, 25–year–old Elizabeth Gumm pulled her Honda up to a drive-up automated teller machine (ATM) at a bank in Hillsboro, Oregon. Randolph and his four associates were waiting nearby in the parked Jeep. As Gumm was withdrawing cash from the ATM, the Jeep pulled alongside her car. Randolph jumped out of the Jeep's passenger side, pointed a loaded semi-automatic assault rifle at Gumm's face from a distance of a few feet, and demanded that she give him her cash. He then moved around to the passenger side of Gumm's car and ordered her to open the passenger door,

pounding on the door when he found it locked. At that moment, Sweere approached Gumm's car from the driver's side and yanked on her seat belt. He ordered her "to do what was told of her" and "she would be okay." When Gumm unlocked the passenger door, Randolph got in the passenger seat, took the cash she had just withdrawn, then demanded all the money in her account. When the ATM would not allow her to withdraw the entire amount, Randolph took the $100 she was able to obtain, along with her wallet. Gumm later testified that she believed Randolph would shoot her if she disobeyed him.

Still wielding the loaded rifle, Randolph ordered Gumm to begin driving, directing her away from the town of Hillsboro. Sweere and the others followed in the Jeep. Randolph later testified that his aim in ordering Gumm to drive away from Hillsboro was to prevent her from immediately contacting the police. Several times during the ride, Gumm asked Randolph to let her stop and get out, but he refused. At one point during the ride, Randolph demanded Gumm's bank card and the personal identification number needed to withdraw cash from her bank account. After fifteen or twenty minutes, Randolph directed Gumm to pull over to the side of the road in a rural area, where he ordered her out of the car. He took the wheel, while she began walking back toward Hillsboro. The Jeep also pulled off the road. Sweere and Gumm both testified that Randolph pulled the Honda alongside the Jeep, and Sweere testified that he thought Randolph and Bond might have conversed. Randolph denies having stopped alongside the Jeep. Randolph turned the Honda around and headed back toward Hillsboro. Gumm did not see Randolph after that.

As Gumm began walking, the Jeep pulled alongside her. Sweere jumped out and ordered her to get into the Jeep. She complied, and the Jeep, driven by Bond, began moving again. Sweere later testified that he was puzzled why Randolph "let[ ] her out of the car so soon[.]" He explained that he and Bond picked up Gumm "[b]ecause I didn't

---

1. Randolph waived his right to a jury trial.

want this lady to walk to a house and be able to call the cops on us right away. We wanted to put her back in the vehicle and drive her up the road and basically mess her sense of direction up." At trial, Randolph testified that he did not expect the others to pick up Gumm and denied seeing them do so. He testified that he thought the others would follow him and that they would abandon the Honda, wipe off their fingerprints, and head home. When he realized the Jeep was not behind him, he drove to find a telephone, then left a voice mail message directing them to meet him at a particular location.

After driving several more miles, Bond stopped the Jeep, and he and Sweere got out to converse. Sweere testified that "[t]he discussion was basically we didn't know what to do." They decided to keep driving. About ten minutes later, they pulled off the road. They ordered Gumm to get out and start walking up a hill. As she began walking, Gumm was struck on the back of the head with a heavy object. She fell to the ground. While lying on the ground, she was kicked in the head several times, then slapped. Gumm was then dragged several yards and kicked down a hill into a ditch. Gumm feigned unconsciousness until her assailants drove away, then ran to a nearby house to get help. As a result of the attack, Gumm sustained two broken fingers, permanent knuckle damage, and head lacerations, and experienced severe headaches. Due to her broken fingers, she had not returned to work as of Randolph's January 1995 trial.

Sweere testified that Bond initiated the kicking, and that he followed suit because "[i]t was just instinct. Basically did it because my friends were doing it." He added, however, that he "didn't want to see this lady go to the cops and tell them what happened to her that night[,]" and that he thought that kicking Gumm in the head might impede her memory of the morning's events. Randolph testified that he "was shocked" to learn of the assault on Gumm, and insisted that the assault was "not part of the plan." Although he admitted knowing Sweere and Bond were large individuals with hot tempers, he insisted he did not think they would hit a woman.

Sweere and the others headed back toward Hillsboro, and he later testified that they "didn't know what to do" at that juncture. En route, they received the page from Randolph instructing them to meet him several miles away. Sweere testified that when Randolph was told about the assault on Gumm, he had little response, although he asked why Sweere and Bond had assaulted her. After meeting Randolph, the group abandoned Gumm's Honda on Sweere's grandparents' property, then burglarized his grandparents' home. When they later saw television broadcasts carrying footage of their actions from the ATM surveillance camera, all but Cooper fled to Mexico.

On October 19, 1994, Randolph was indicted on one count of carjacking in violation of 18 U.S.C. §§ 2119 and 2. Although Sweere was indicted as a co-defendant, he agreed to testify for the prosecution in exchange for a ten-year federal sentence and a promise that no state charges would be brought against him.[2]

At trial, Randolph consistently denied having any intention to kill or to harm Gumm, and insisted that the group's plan was merely to rob, not to harm anyone. He testified that he wielded the rifle to intimidate Gumm into giving up her money and car, but claimed that he had no intention of actually using the firearm, even had she resisted. He testified that he drove Gumm away from town solely to prevent her from immediately contacting the police.

Sweere's testimony conflicted as to whether the group had a "plan" on the morning of October 5. Although he testified that "[w]e didn't sit down and plan nothing[,]" other portions of his testimony suggest a plan but do not elucidate the nature and scope of the plan. He did testify that a week before the crime, Randolph and Cooper engaged in a "dry run" of the robbery at the Hillsboro bank, and that Bond and Randolph initiated the outing to the bank on the morning of October 5 and were "in control" of the group. Sweere also surmised that "obviously there was a plan [as to what was to happen at the bank] or else it wouldn't have happened. We

---

**2.** Randolph was convicted of robbery in state court.

wouldn't be sitting here in this courtroom today."

The district court found Randolph guilty of carjacking, concluding that the government had offered sufficient evidence to establish that Randolph had acted with the requisite intent "to cause death or serious bodily harm." The court subsequently sentenced Randolph to 144 months imprisonment.

## ANALYSIS

### 1. The Constitutionality of 18 U.S.C. § 2119.

■ As an initial matter, Randolph challenges the constitutionality of his indictment under the federal carjacking statute, 18 U.S.C. § 2119, arguing that the rationale of *United States v. Lopez*, — U.S. —, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), should extend to the federal carjacking statute. Randolph contends 18 U.S.C. § 2119 exceeds Congress's power to regulate interstate commerce "because [the statute] lacks a rational nexus to interstate commerce and usurps the constitutional role of the states in regulating theft and robbery offenses."

*Lopez* described Congress's power under the Commerce Clause to include the power to regulate the "channels" and the "instrumentalities" of interstate commerce, as well as those activities that "substantially affect[ ] interstate commerce." *Lopez*, — U.S. at — – —, 115 S.Ct. at 1629–30. *Lopez* invalidated the Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), because the statute regulated neither the channels nor the instrumentalities of interstate commerce, and "ha[d] nothing to do with commerce or any sort of economic enterprise." *Id.* at — – —, 115 S.Ct. at 1630–31 (internal quotations omitted).[3]

Randolph's challenge to the constitutionality of 18 U.S.C. § 2119 is squarely refuted by our post-*Lopez* decision in *United States v. Oliver*, 60 F.3d 547 (9th Cir.1995), in which we held that the federal carjacking statute is a valid exercise of the Commerce Clause

power. As we explained in *Oliver*, the federal carjacking statute differs from the Gun–Free School Zones Act invalidated in *Lopez* in three important respects: (1) cars are themselves "instrumentalities" of interstate commerce, (2) the carjacking statute applies only to cars that have moved in interstate commerce, and (3) Congress, in enacting the carjacking statute, targeted carjacking's harmful effect on interstate commerce. *Oliver*, 60 F.3d at 550. Because *Oliver* squarely governs this issue, Randolph's challenge to the constitutionality of 18 U.S.C. § 2119 must fail.

### 2. Sufficiency of the Evidence of Randolph's Intent to Cause Death or Serious Bodily Harm

■ The heart of Randolph's appeal is that there was insufficient evidence to establish the intent element of 18 U.S.C. § 2119, which requires the government to prove beyond a reasonable doubt that he took the car "with the intent to cause death or serious bodily harm." The standard of review is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).[4] This standard applies to both jury trials and bench trials. *United States v. Mayberry*, 913 F.2d 719, 721 (9th Cir.1990) (citation omitted).

### a. The New Intent Element of 18 U.S.C. § 2119

■ The intent element is a recent addition to 18 U.S.C. § 2119. In 1994, Congress amended the federal carjacking statute by substituting the phrase "with the intent to cause death or serious bodily harm" for the phrase "possessing a firearm as defined in section 921 of this title." Violent Crime Control and Law Enforcement Act of 1994, § 60003(a)(14), Pub.L. No. 103–322, 108 Stat.

---

**3.** The Gun–Free School Zones Act of 1990, 18 U.S.C. § 922(q), made it a federal crime to knowingly possess a firearm at or near a school. *Lopez*, — U.S. at —, 115 S.Ct. at 1626.

**4.** To properly preserve for appeal a challenge to the sufficiency of evidence, the defendant must move for acquittal at the close of all evidence, which Randolph did. *Oliver*, 60 F.3d at 551.

1796, 1970 (1994). 18 U.S.C. § 2119 now defines carjacking as follows:

"Whoever, *with the intent to cause death or serious bodily harm* takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so[.]"

18 U.S.C. § 2119 (emphasis added).

The amendment to § 2119 took effect September 13, 1994, less than one month before the events underlying Randolph's indictment. Randolph was therefore charged under the amended version of § 2119. Before trial, Randolph conceded that he took Gumm's car from her during an armed robbery. The parties agreed that the amendment rendered § 2119 a specific intent offense, and furthermore agreed that the sole issue at Randolph's trial was whether he took Gumm's car "with the intent to cause death or serious bodily harm[.]"

■ Although no federal court appears to have construed § 2119's new intent element, our analysis of the amended statute leads us to conclude that the amendment converted carjacking from a "general intent" to a "specific intent" offense. In determining whether a crime is a general intent offense or a specific intent offense, we look to such factors as "the elements of the offense" and "the words and the purpose of the statute[.]" *United States v. Jim,* 865 F.2d 211, 213 (9th Cir.1989), *cert. denied,* 493 U.S. 827, 110 S.Ct. 93, 107 L.Ed.2d 58 (1989). In explicit terms, the amended § 2119 requires that the defendant acted *"with the intent to* cause death or serious bodily harm[.]" 18 U.S.C. § 2119 (emphasis added). The reasoning of our past decisions suggests that this language establishes a requirement of specific intent. We have said that "if Congress wished to establish a specific intent crime, it would [write] 'with the intent to' [do a particular act.]" *Jim,* 865 F.2d at 214 (*citing United States v. Meeker,* 527 F.2d 12, 14 (9th Cir.1975)). Here, Congress used precisely that phrase—"with the intent to"—thus incorporating a specific intent element into § 2119. The legislative history of the amendment to § 2119—though sparse—does not contravene our conclusion. The House Conference Report on the Violent Crime Control and Law Enforcement Act of 1994 simply describes the change in language, and characterizes that change as the "addition of an intent standard for carjacking." H.R. Conf. Rep. 103–711 (August 21, 1994).

Our conclusion that the amendment to § 2119 renders carjacking a specific intent offense is confirmed by our decisions construing federal criminal statutes with similar language. In *United States v. Martin,* 783 F.2d 1449 (9th Cir.1986), for example, we noted that 18 U.S.C. § 113(c) is a specific intent offense. *Martin,* 783 F.2d at 1450; *accord United States v. Washington,* 819 F.2d 221 (9th Cir.1987). That statute, which has been recodified at 18 U.S.C. § 113(a)(3),[5] prohibits "assault with a dangerous weapon, with intent to do bodily harm[.]" The close resemblance between the language of § 113(c) and that of amended § 2119, which requires "the intent to cause death or serious bodily harm[,]" reinforces our conclusion that in amending § 2119, Congress made it a specific intent offense.

Although we earlier construed the former version of § 2119 as a general intent offense, see *United States v. Martinez,* 49 F.3d 1398 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 749, 133 L.Ed.2d 696 (1996), the amendment to § 2119 removes the basis for our earlier conclusion. In *Martinez,* we explained, first, that § 2119 contained no reference to intent, and noted that "[w]hen a statute does not contain any reference to intent, general intent is ordinarily implied." *Martinez,* 49 F.3d at 1401. Next, we explained that the "structure, language, and legislative history of section 2119 indicate that the ... appropriate analogy is to [the federal bank robbery statute][,]" 18 U.S.C. § 2113(a), a statute we had interpreted to require proof of general intent only. At the time *Martinez* was decided, § 2119 and § 2113(a) were parallel statutes: § 2119 defined carjacking as the taking of a car "by force and violence or by intimidation" while in possession of a firearm, while § 2113(a)

---

**5.** *See* Section 170201(c)(5) of Pub.L. 103–322, 108 Stat.2042 (1994).

defined bank robbery as the taking of property or money "by force and violence, or by intimidation[.]" *Id.* In its current form, however, § 2119 has lost the characteristics we found dispositive in *Martinez.* The added requirement that the government show "intent to cause death or serious bodily harm" refutes the presumption of general intent, and furthermore creates a sharp distinction between § 2119 and § 2113(a), which contains no mention of intent.

Finally, although no federal court has squarely addressed whether the amendment makes § 2119 a specific intent crime, the First Circuit, in dicta, has suggested such a change. In *United States v. Rivera–Gomez,* 67 F.3d 993 (1st Cir.1995), the First Circuit applied the old version of § 2119, but observed in a footnote that the amendment to § 2119 "changes the focus of the fourth element from weaponry to intention, requiring that the prosecution prove that the defendant perpetrated the carjacking crime with the *specific intent* of causing death or serious bodily harm." *Rivera–Gomez,* 67 F.3d at 996, n. 1 (emphasis added). *See also United States v. Moore,* 73 F.3d 666, 668, n. 1 (6th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1866, 134 L.Ed.2d 964 (1996) (noting in dicta that § 2119 had "been amended to require an intent to cause death or serious bodily harm").

The addition of a specific intent element requires the government to prove "a special mental element ... above and beyond any mental state required with respect to the [taking of the motor vehicle]." *See* LaFave and Scott, 1 *Substantive Criminal Law* 315 (1986). In this case, that "special mental element" is the "intent to cause death or serious bodily harm." 18 U.S.C. § 2119. We turn to the central issue of this appeal: whether there was sufficient evidence that Randolph took Gumm's car "with the intent to cause death or serious bodily harm."

#### b. The Sufficiency of Evidence Underlying the Intent Element

■ Although Randolph concedes that he took Gumm's car by "force and violence or by intimidation[,]" he contends there was no evidence that he intended to harm Gumm, and no evidence that he was part of a group plan to do so. He insists that his sole intent was to rob Gumm of her property. The government argues that Randolph's intent to cause serious bodily harm "can be inferred from the facts and circumstances of the offense[,]" and points to several facts the district court relied on in "conclud[ing] it could properly infer ... a plan which included the specific intent to cause harm to the victim." The circumstantial evidence on which it relies includes Randolph's wielding of the semiautomatic rifle, the planned nature of the robbery, the perpetrators' use of a stolen Jeep, Randolph's involvement in a "dry run" of the robbery a week earlier, Sweere's testimony that there was "some kind of plan," Gumm's fear during the ordeal, Sweere's admonition to Gumm that she would "be okay" if she did what she was told, the perpetrators' lack of disguise, Randolph's continued willingness to associate with Sweere and the others following the assault, and his subsequent flight to Mexico. The government argues that these facts, considered "in their entirety," support an inference that Randolph acted with the requisite specific intent.

A defendant's intent " 'may be inferred from objective facts and the actions of the defendant.' " *United States v. Hernandez,* 952 F.2d 1110, 1114 (9th Cir.1991), *cert. denied,* 506 U.S. 920, 113 S.Ct. 334, 121 L.Ed.2d 252 (1992) (*quoting United States v. Birges,* 723 F.2d 666, 672 (9th Cir.), *cert. denied,* 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984)). In evaluating "the presence or absence of specific intent[,]" it is well-settled that "[t]he trier of fact is entitled to regard the evidence as a whole and to consider all the surrounding relevant circumstances[.]" *United States v. Brown,* 578 F.2d 1280, 1286 (9th Cir.), *cert. denied,* 439 U.S. 928, 99 S.Ct. 315, 58 L.Ed.2d 322 (1978) (*citing Benchwick v. United States,* 297 F.2d 330, 336 n. 5 (9th Cir.1961)).

Our consideration of the facts and circumstances of this case leads us to the conclusion that the government failed to produce sufficient evidence that Randolph acted "with the intent to cause death or serious bodily harm[,]" as required by § 2119. The nature

and quantum of evidence in this case stands in sharp contrast to federal cases addressing the sufficiency of evidence underlying analogous specific intent elements, and the evidence ultimately does not support an inference that Randolph possessed the specific intent necessary under § 2119.

A key distinction between this case and federal cases sustaining convictions for analogous specific intent offenses is that Randolph did not personally harm Gumm, even though he was armed and clearly capable of harming her. Moreover, he did not participate in Bond and Sweere's assault on Gumm, and, indeed, was nowhere near the site of the assault. In this respect, Randolph's conduct differs dramatically from that of other defendants who have challenged the sufficiency of evidence underlying analogous specific intent elements.

In numerous federal cases sustaining convictions premised on a specific intent to kill or to harm, the defendant himself actually killed or seriously harmed his victim. In *United States v. Belgard*, 894 F.2d 1092 (9th Cir.), *cert. denied*, 498 U.S. 860, 111 S.Ct. 164, 112 L.Ed.2d 129 (1990), for example, we concluded that the jury "could easily infer [the defendant's] inten[t] to inflict injury," where the defendant threw his victim to the ground and kicked her in the stomach with steel-toed work shoes with such force that he ruptured her small intestine. *Belgard*, 894 F.2d at 1095 (upholding conviction for assault resulting in serious bodily injury, 18 U.S.C. § 113(f)). In *Gray v. Lynn*, 6 F.3d 265 (5th Cir.1993), the Fifth Circuit reversed a conviction for attempted murder on the basis of instructional error. In the course of that decision, however, the court noted that the jury could have found that the defendant intended to cause great bodily harm to his victim, where the defendant appeared at his victim's door with a gun, announced that he was going to "blow [his] brains out," struck him in the head with the gun several times, then fired three shots toward the victim at close range. *Gray*, 6 F.3d at 270. The Eighth Circuit in *United States v. Slow Bear*, 943 F.2d 836 (8th Cir.1991) affirmed the defendant's conviction for assault with a dangerous weapon with intent to inflict bodily harm in violation of 18 U.S.C. §§ 1153 and 113(c). There, the defendant struck the victim in the back of the head with a "broomhandle-like stick" and the victim sustained a fractured skull and multiple lacerations and bruises. *Slow Bear*, 943 F.2d at 837. In *United States v. Dennison*, 937 F.2d 559 (10th Cir.1991), *cert. denied*, 502 U.S. 1037, 112 S.Ct. 886, 116 L.Ed.2d 789 (1992), the Tenth Circuit upheld a conviction for assault with a dangerous weapon with intent to inflict bodily harm, 18 U.S.C. §§ 1153 and 113(c), where the defendant cut the victim's throat and face with a knife several times. *Dennison*, 937 F.2d at 561. In *Scott v. Louisiana*, 934 F.2d 631 (5th Cir.1991), the Fifth Circuit held the evidence sufficient to support a conviction for second-degree murder based on the defendant's intent to kill or do great bodily harm. In that case, the defendant led his victims to a deserted road and began shooting at them. *Scott*, 934 F.2d at 634. In *United States v. Gibson*, 896 F.2d 206 (6th Cir.1990), *aff'd*, 948 F.2d 1288 (6th Cir.1991), the Sixth Circuit addressed a sufficiency of evidence challenge to a conviction under 18 U.S.C. § 113(c), assault with intent to do bodily harm. In that case, the defendant was found to have had the requisite intent to do bodily harm where he engaged national park police in a fourteen-mile car chase through a national park, then deliberately gunned his car toward an officer and struck him. *Gibson*, 896 F.2d at 209. Finally, in *United States v. Guilbert*, 692 F.2d 1340 (11th Cir.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1260, 75 L.Ed.2d 487 (1983), the Eleventh Circuit found sufficient evidence of a defendant's specific intent to inflict bodily harm, as required under 18 U.S.C. § 113(c), noting that the defendant assaulted a pool-hall manager, cut him with a broken beer bottle, and chased him, all the while repeatedly threatening to kill him. *Guilbert*, 692 F.2d at 1344.

In one of the few federal cases to *reverse* a conviction based on insufficient evidence of intent to inflict serious bodily injury, the defendant did not *himself* inflict serious bodily injury. In *United States v. Knife*, 592 F.2d 472 (8th Cir.1979), the defendant, Knife, was convicted under 18 U.S.C. §§ 1153 and 113(f) for assault resulting in serious bodily

injury. In that case, Knife's co-defendant shot a police officer, causing him serious bodily injury. Although Knife was present and scuffled with another officer, he did not actually participate in the shooting of the first officer. Nonetheless, the government attempted to prove that Knife had aided and abetted his co-defendant in the assault "through his participation in a scheme to lure [the police officer] onto Indian property and into an ambush." *Knife*, 592 F.2d at 476. A conviction based on aiding and abetting, the Eighth Circuit noted, required a finding "that the defendant had a 'purposeful attitude' and in some manner participated in the unlawful deed[.]" *Id.* (citations omitted). As evidence of Knife's alleged "purposeful attitude," the government relied chiefly on two statements Knife allegedly made: (1) his comment that residents of the Indian community where the shooting took place blamed the patrolman for the earlier prison death of a community member, and (2) his comment to an officer, immediately after the shooting, that "you didn't think we'd just let [the patrolman] off for killing one of our friends in the jail the other night, did you?"

The Eighth Circuit reversed Knife's conviction, concluding there was insufficient evidence that Knife had the requisite "purpose or intent" to assist his co-defendant in assaulting the officer. *Id.* at 478. The *Knife* court noted that Knife was not armed at the time of the assault, and did not encourage his co-defendant to approach or to shoot the officer. It explained that Knife's statement about sentiments in the Indian community "[did] not alone establish a purpose or intent" to assault the officer, *id.,* while his comment after the shooting was not necessarily a "statement of intent" but could instead be "an explanation or rationalization" for the co-defendant's shooting of the officer. *Id.*

■ Compared with federal cases addressing the sufficiency of evidence underlying analogous specific intent elements, the instant case lacks the factors typically found to demonstrate a specific intent to cause death or serious bodily harm. Although Randolph wielded a semi-automatic rifle in commandeering his victim's vehicle and taking her money, he never discharged the weapon, and did not physically harm his victim, despite the ample opportunity he had to do so. We conclude that the brandishing of a weapon, without more, does not support an inference of specific intent under § 2119. In amending § 2119, Congress replaced the "firearm" element with the current specific intent element. Although Randolph's possession of the rifle would clearly have sustained his conviction under the old version of § 2119, the revised § 2119 requires something quite different: the specific intent to kill or to inflict serious bodily harm. The facts of this case do not support a connection between Randolph's brandishing of the rifle and a specific intent to cause death or serious bodily harm. Randolph had numerous chances to kill or to harm Gumm, had that been his actual intent. The events in this case strongly suggest, however, that Randolph's intent in brandishing the weapon was *not* to kill or to harm but merely to intimidate Gumm into relinquishing her car and money.

Instead of harming Gumm, Randolph deposited her, unscathed, several miles from town. He made no attempt to pursue or to harm her, but instead released her. This behavior belies an intent to kill or to harm, and, indeed, indicates that once Randolph had taken Gumm's money and car and dropped her where she could not quickly notify the police, his use for her was finished. Moreover, Randolph did not personally participate in the assault on Gumm, and was miles from the site of the assault. These facts undermine the government's contention that Randolph specifically intended to kill or to harm Gumm.

This conclusion is bolstered by a second important difference between this case and the cases upholding the sufficiency of evidence of specific intent: Randolph said nothing to indicate any animosity toward the victim, much less to suggest a specific intent to cause her death or serious bodily harm.

It is instructive to compare Randolph's actions and words to those of the defendant in *United States v. McInnis*, 976 F.2d 1226 (9th Cir.1992). The defendant in *McInnis* fired two rifle shots through the home of his neighbors, an African–American family,

striking one of the family members in the stomach. *McInnis,* 976 F.2d at 1228. McInnis was convicted for the use of force to interfere with housing rights on account of race in violation of 42 U.S.C. § 3631(a), which requires the government to prove that the defendant acted with "the specific intent to injure, intimidate or interfere with the victim because of her race and because of the victim's occupation of her home." *Id.* at 1230. McInnis appealed his conviction based, in part, on his assertion that the evidence was insufficient to establish that he had the specific intent necessary for a violation of § 3631(a). In *McInnis,* we held the evidence sufficient to establish that the defendant acted with the requisite specific intent. Central to our holding were the racially derogatory remarks McInnis made before and after the shooting. *Id.*

Unlike the defendant in *McInnis,* Randolph made no statements that would suggest to Gumm or to his accomplices that he intended to kill or harm Gumm. He simply ordered Gumm to surrender her money and her car. Although Sweere's statement to Gumm that "she would be okay" if she "[did] what was told of her" has the ring of a threat, this is not dispositive. In the first place, a threat by Sweere does not, without more, convincingly support an inference that Randolph specifically intended to harm Gumm. There was no evidence in this case to suggest that Sweere's threat reflected Randolph's subjective intent. Although this threat badly frightened Gumm, her subjective fear, without more, does not establish Randolph's subjective intent to kill or to harm her.

■ More importantly, it appears to us that the new intent element of § 2119 demands something more than a threat or a mere *conditional* intent to harm. We base

this conclusion on the language and structure of the amended § 2119. First, the statute defines carjacking as the taking of a car from another "by force and violence or by intimidation" by one who has "the intent to cause death or serious bodily harm." The "tak[ing] ... by force and violence or by intimidation" element, by its terms, requires either force and violence *or* intimidation. In our view, a threat satisfies the "intimidation" prong of the "taking" element. Here, for example, Randolph satisfied the "taking" element when he brandished a gun to intimidate Gumm into giving up her car and money. However, the statute *additionally* requires proof of an intent to cause death or serious bodily harm. To construe a mere threat as conclusive evidence of the new intent element would be to eliminate that additional intent element. Given the elements of § 2119, we conclude that more than a mere threat is required to establish a specific intent to kill or harm.[6] Second, Sweere's threat was tantamount to a *conditional* intent to harm, whereas the plain language of § 2119 requires the government to prove that the causation of "death or serious bodily harm" was the defendant's *actual* intent. The mere conditional intent to harm a victim *if* she resists is simply not enough to satisfy § 2119's new specific intent requirement.

A third factor contravening the government's contention that Randolph acted with the requisite specific intent is that the evidence indicates Sweere and Bond acted impulsively and independently of Randolph in assaulting Gumm. Our case law suggests that the impulsive unlawful actions of one's co-defendants does not suffice to establish a defendant's intent to further those actions. We recently reversed a conviction for the aiding and abetting of murder and attempted voluntary manslaughter because we conclud-

---

**6.** We note that the Fifth Circuit upheld a conviction under 18 U.S.C. § 113(c) on the basis of a defendant's brandishing of a weapon and his threat to shoot his prison guards and fellow prisoners if they impeded his attempt to escape from prison. *See Shaffer v. United States,* 308 F.2d 654 (5th Cir.1962), *cert. denied,* 373 U.S. 939, 83 S.Ct. 1544, 10 L.Ed.2d 694 (1963). We decline to apply this principle in the context of 18 U.S.C. § 2119. We note an important distinction between 18 U.S.C. § 113(c) and 18 U.S.C.

§ 2119: Whereas § 113(c) requires only three elements—assault with a dangerous weapon and an intent to do bodily harm, § 2119 requires that a defendant take a victim's car "by force and violence or by intimidation," as well as with "the intent to cause death or serious bodily harm." 18 U.S.C. § 2119. As we explained in the text, to construe a threat to satisfy § 2119's intent element as well as its "taking" element would be to make surplusage of the intent element.

ed there was insufficient evidence that the defendant "specifically intended to facilitate the commission of [the] crimes" by his co-defendant. *United States v. Andrews*, 75 F.3d 552, 555 (9th Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 1890, 135 L.Ed.2d 183 (1996). In that case, the defendant's sister and co-defendant got into a scuffle with the victims, then left to tell Andrews, the defendant, about the incident. The sister enlisted Andrews' assistance in her plan, which she told him was to "get" a particular victim and to "trash" the victim's car. After arming themselves with rifles, Andrews and his sister both returned to the scene of the earlier altercation. When the victim they sought stepped out of his car with raised hands, Andrews approached and shot him. His sister then approached the car and began firing into it, killing another victim and wounding two more. *Andrews*, 75 F.3d at 554.

We reversed Andrews' conviction for aiding and abetting his sister in the murder and attempted murder of the three victims she shot. We first noted that a conviction under an aiding and abetting theory requires evidence establishing (1) that the defendant "*specifically intended* to facilitate the commission of [the co-defendant's] crimes," (2) that the defendant " 'had the requisite intent' " for those crimes, (3) that the defendant " 'assisted or participated' " in the crimes, and (4) that the co-defendant committed the crimes. *Id.* at 555 (emphasis added). In Andrews' case, we concluded there was no evidence that Andrews "knowingly and intentionally aided, counselled, commanded, induced, or procured [his sister] to shoot the people in the car." *Id.* In particular, we pointed out that Andrews did not give his sister the rifle, drive her to the scene, encourage her to shoot the other victims, or "in any other obvious way assist her in shooting the victims in the car," *id.*, and we noted that "there [was] no evidence that [Andrews] shared [his sister's] intent to hurt anyone other than the [first victim]." *Id.* at 556. Based on these facts, we concluded that Andrews' sister had "acted impulsively and on her own" in killing and harming her victims, and that Andrews' conviction for aiding and abetting was not supported by sufficient evidence.

The assault on Gumm similarly appears to have been an impulsive act on the part of Sweere and Bond. There was no evidence to suggest that Randolph anticipated or expected that his associates would assault Gumm, much less that he assisted them in their efforts. Randolph admittedly knew Sweere and Bond were large, powerful individuals with bad tempers. At most, however, such knowledge might suggest that Randolph could have *foreseen* the assault, but it does not establish that Randolph *intended* the assault, as required under § 2119. Moreover, Sweere's own testimony suggests that the assault was an impulsive act wholly independent of Randolph. Sweere testified that he was surprised when Randolph released Gumm so early, and explained that he and Bond decided to pick her up in order to "mess her sense of direction up." When asked why he began kicking and slapping Gumm, Sweere testified that "[i]t was just instinct." In addition, Sweere's testimony that Randolph asked Sweere and Bond why they had assaulted Gumm suggests that Randolph did not expect that assault.

In this case, the government contends that the evidence permits an inference that Randolph was part of "a [group] plan which included the specific intent to cause harm to the victim." It points to such factors as the district court's conclusion that "the robbery at the ATM machine was clearly coordinated and planned[,]" the group's presence at the ATM and its use of the stolen Jeep, as well as the possibility that Randolph and Bond conversed after Randolph released Gumm. It also points out that after Randolph learned of the assault on Gumm, he remained with the group, committing additional crimes and fleeing to Mexico with them. Finally, the government notes that Sweere testified that "there was a plan or else it wouldn't have happened."

In our view, this evidence is simply insufficient to establish either a group plan to assault Gumm, or Randolph's involvement in such a plan. First, the apparent planning of the robbery at the ATM adds nothing in the way of an intent to inflict death or serious bodily harm. A plan to rob does not neces-

sarily entail a plan to kill or to harm. Second, there is no apparent connection between the use of the Jeep and an intent to inflict serious bodily injury. The Jeep was nothing more than a means of transportation to the robbery scene, and the presence of the other participants does not suggest an intent to harm, since a carjacker could obviously have § 2119's requisite specific intent even if he did not bring along an extra car or accomplices. Third, the allegation that Bond and Randolph conversed was sheer speculation on the part of Sweere. Fourth, Sweere's testimony was ridden with contradictions as to whether the group even had a plan, and contained no affirmative declaration that the group plan went beyond an intent to "get some money." Finally, Randolph's reunion with the group, *after* Sweere and Bond assaulted Gumm, cannot retroactively imbue Randolph's earlier actions with the specific intent necessary to the commission of the crime.

Having considered the facts and circumstances of this case, we conclude that the evidence was insufficient to establish Randolph's specific intent "to cause death or serious bodily harm." This case differs dramatically from cases addressing the quantum of evidence needed to establish an intent to "cause death or serious bodily harm." Randolph did not harm Gumm, never announced an intent to do so, and had no hand in her assault, and the government failed to establish any group "plan" beyond the robbery. It goes without saying that Elizabeth Gumm endured a terrifying ordeal. It is also unquestionable that Randolph's conviction would stand had he been charged under the old version of § 2119, which required the mere possession of a firearm. But Congress, in its wisdom, has removed the firearm element and replaced it with an intent element, thereby requiring the government to prove that Randolph acted "with the intent to cause death or serious bodily harm." Given the

particular facts and circumstances of this case, we have no choice but to vacate Randolph's conviction for lack of sufficient evidence of an intent to kill or to cause serious bodily harm.[7] Because we vacate the conviction, we need not address the sentencing issue.

### CONCLUSION

Because we conclude that the evidence was insufficient to establish that Randolph intended to cause death or serious bodily harm, we vacate Randolph's conviction under 18 U.S.C. §§ 2119 and 2.

---

7. The government suggests in a footnote that Randolph's conviction may be upheld on an aiding and abetting theory. We disagree. Conviction under an aiding and abetting theory requires that the evidence establish (1) a defendant's specific intent to facilitate commission of a co-defendant's crime, (2) that the defendant had the requisite intent required for that crime, (3) that the defendant assisted or participated in that crime, and (4) that the co-defendant committed the crime. *Andrews*, 75 F.3d at 555. Because the evidence of Randolph's intent is insufficient to sustain his conviction under § 2119 as a primary offender, that evidence cannot support his conviction under an aiding and abetting theory.