# Third District Court of Appeal

**State of Florida**

Opinion filed September 6, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-304
Lower Tribunal No. 09-14217
_____

**Jason Beckman,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Rodney Smith, Judge.

Carlos J. Martinez, Public Defender, and Jonathan Greenberg, Assistant Public Defender, for appellant.

Pamela Jo Bondi, Attorney General, and Jonathan Tanoos, Assistant Attorney General, for appellee.

Before SUAREZ, LAGOA and SCALES, JJ.

SCALES, J.

Jason Beckman, the defendant below, appeals his conviction and sentence for first degree premeditated murder, claiming that he is entitled to a new trial based on erroneous evidentiary rulings by the lower court and improper closing argument by the prosecutor. The defendant also argues that Florida's sentencing scheme for juveniles convicted of capital crimes, which comports with Miller v. Alabama, 567 U.S. 460 (2012), violates Apprendi v. New Jersey, 530 U.S. 466 (2000). See § 921.1401, Fla. Stat. (2015). Finding no abuse of discretion as to any of the alleged trial errors and concluding that the defendant's sentence was constitutional, we affirm for the following reasons.

### *The underlying facts*

On April 12, 2009, the then seventeen-year-old defendant shot and killed his father with a shotgun in the bathroom of their home, while his father was taking a shower. The shotgun had two barrels, each with a safety. At the time of the shooting, one safety was on and one was off. Each chamber was loaded with live ammunition. The shotgun trigger required two to four pounds of pressure to fire. The defendant fired the shotgun once, while standing just four and half to six feet from his father, who was standing in the shower tub taking a shower.

The shotgun pellets went through the shower curtain, hitting the father in the neck and face. The pellets lacerated his tongue, fractured his jaw, broke or

2

displaced his teeth and lodged inside his head, causing hemorrhaging in the brain. He bled to death after several minutes.

Within a minute of the shooting, the defendant called out, "Oh my God, call 911" loud enough for a neighbor, Frank Alfonso, to hear. During the 911 call, the defendant told the police dispatch, "Please, come quickly, I accidentally shot my father." He then stated that he was going hunting with his father and that he had gone into the bathroom to show his father a shotgun, which accidentally went off even though the safety was on.

Upon arriving at the scene, the police searched the home and found the defendant's book bag in a bedroom. In the book bag was a spiral notebook, the first page of which was labeled "The List" at the top. Underneath the title were ten names that were each preceded by a Roman numeral III, IV or V. The father's name was at the top of the page and was the only name with a roman numeral V next to it. Other names on the list included those of the defendant's teachers and classmates.

The defendant was arrested and charged by indictment with first-degree premeditated murder with a firearm that discharged and caused death, and unlawful possession of a firearm while engaged in a criminal offense.[1] The State's theory was that the defendant had a longstanding hatred for his father and that he

---

[1] The State dismissed the unlawful possession charge at trial.

3

had intentionally shot and killed him. The defendant admitted to shooting his father, but claimed it was an accident.

While in jail awaiting trial, the defendant shared a cell with Michael Nistal, who claimed the defendant had told Mr. Nistal about the shooting. According to Mr. Nistal, who gave a statement to the police about his jailhouse conversations, the defendant stated that he shot his father in the face with the shotgun because he hated him and that he would have used a knife had he not underestimated the circumstantial evidence in the case. Mr. Nistal also claimed that the defendant kept another list of names while he was in jail, which included the names of fellow inmates and the defendant's neighbors. Mr. Nistal claimed that the defendant told him that he wanted to kill the neighbors because they were potential trial witnesses.

At trial, the court permitted the State to introduce The List found in the defendant's book bag. The court also allowed the State to present several of the defendant's classmates and teachers, who testified that the defendant told them why he had created The List, and as to how certain people ended up being placed on The List. Several of these witnesses testified that the defendant told them that he hated his father and wanted him to die, even offering one witness money if he would kill the defendant's father. The court also permitted the State to elicit

4

testimony, through Mr. Nistal, about the second list the defendant maintained while awaiting trial.

The court excluded any evidence that the defendant suffers from Asperger's syndrome, finding that his condition only goes to diminished capacity, which is an impermissible defense in Florida. Nevertheless, the court did permit the defense to introduce testimony that the defendant is "weird," and speaks "oddly," "out of turn" and in a "monotone" voice as a means of explaining his mannerisms and demeanor.

The court excluded the content of the defendant's 911 call to police dispatch, finding it did not satisfy the excited utterance exception to the hearsay rule. The court did so upon determining that the defendant had an opportunity to reflect prior to making the call. In so holding, the court relied upon the testimony of the defendant's neighborhood friend, Lisa Syren. She testified that, just two weeks prior to the shooting, the defendant had both shown her the shotgun and said that he wanted to shoot his father with it and make it look like self-defense.

During closing argument, the prosecutor made a number of comments—some objected to, some not—which the defendant claims amounted to misconduct and which entitle him to a new trial. The court denied his motion for a new trial.

The jury convicted the defendant as charged of first degree premeditated murder. Because he was seventeen years and twenty-nine days old at the time of

the offense, the trial court conducted an individualized sentencing hearing under section 921.1401 of the Florida Statutes. The trial court imposed a sentence of life in prison, later amended to life with judicial review after twenty five years. This appeal ensued.

On this appeal, the defendant claims the trial court abused its discretion by: permitting the prosecutor to introduce bad character evidence with respect to The List and the second list he kept in jail awaiting trial; precluding the defense from introducing testimony that the defendant had Asperger's syndrome; excluding the defendant's 911 call to the police as hearsay; and denying the defense motion for mistrial based on improper closing argument. The defendant also argues that the individualized hearing for juveniles set forth in section 921.1401 of the Florida Statutes violates Apprendi because the trial court, not the jury, conducts the individualized hearing and determines whether a life sentence is appropriate. We address each claim separately.

### *Evidence of The List*

***Background facts***

The List contained ten names with a Roman numeral preceding each name. The father's name was at the top of The List and was the only name with a Roman numeral V next to it. Of the remaining nine names on The List, there were seven

6

names with a Roman numeral IV and two with a Roman numeral III. There were no Roman numerals I or II.

At a motion in limine hearing, the State argued that an un-redacted copy of The List should be presented to the jury because it was "inextricably intertwined" evidence. See § 90.402, Fla. Stat. (2013) ("All relevant evidence is admissible, except as provided by law."). To this end, the State commented that "witnesses will come in and testify that they knew the Defendant had a list . . . and he described to them what the list was for." The State proffered that the witnesses would "discuss the levels of the list" and that the defendant regularly stated that he hated his father and wanted to kill him. The State also noted that "everyone on this list had an incident with this Defendant that they can recall." The trial court ruled that The List would be admitted at trial.

At trial, the court was asked to clarify its earlier ruling with respect to the witnesses who would be testifying about The List. The defense objected to any witnesses testifying as to any personal incident they had with defendant that resulted with either their name being placed on The List, or the defendant telling them their name had been placed on The List. Defense counsel argued that none of the unrelated incidents were relevant as to whether the defendant intentionally killed his father. In response, the State argued that the witnesses' testimony as to the unrelated incidents would provide an "understanding of this list" insofar as it

7

was evidence of "the way that the Defendant keeps track of people whom he does not like and that he intends to punish." The trial court agreed with the State and ruled their testimony was admissible.

Consistent with the court's rulings, the State introduced the testimony of several of the defendant's former classmates and teachers at trial with respect to The List.

*Analysis*

The defendant argues that, by allowing witnesses to testify as to why people were on The List, the trial court erroneously admitted Williams[2] rule evidence, i.e., collateral evidence of uncharged bad acts introduced solely to prove the defendant's bad character or propensity to commit crime, in violation of section 90.404(2)(a) of the Florida Statutes. The State counters that though it did provide a Williams Rule notice at trial, it ultimately sought to introduce the witnesses' testimony only under section 90.402 of the Florida Statutes, which provides that "[a]ll relevant evidence is admissible, except as provided by law." Because the State's argument is well taken, we address only the section 90.402 argument. See Griffin v. State, 639 So. 2d 966, 968 (Fla. 1994) ("[E]vidence of uncharged crimes which . . . is inextricably intertwined with the crime charged, is not Williams rule evidence.").

_____

[2] Williams v. State, 110 So. 2d 654 (Fla. 1959).

In Dorsett v. State, 944 So. 2d 1207, 1213 (Fla. 3d DCA 2006) (citations omitted), this court sitting *en banc* stated the standard under section 90.402 for admitting relevant evidence of uncharged collateral acts that is considered to be "inextricably intertwined" with the charged crime(s):

> Evidence is inextricably intertwined if the evidence is necessary to (1) "**adequately describe the deed**,"; (2) **provide an intelligent account of the crime(s) charged**; (3) **establish the entire context out of which the charged crime(s) arose**; or (4) **adequately describe the events leading up to the charged crime(s)**.

Collateral evidence is admissible under section 90.402 if it is a "relevant and inseparable part of the act which is in issue." Id. at 1214-15 (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)). If this standard is met, the court must then decide if the probative value of introducing such evidence is "substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." Id. at 1212 (quoting § 90.403, Fla. Stat.). This court reviews the trial court's ruling on admissibility of such evidence for an abuse of discretion. See Knight v. State, 15 So. 3d 936, 938 (Fla. 3d DCA 2009). "In the context of the trial proceedings to that point, [where] reasonable trial judges might well disagree on whether the defense objection should have been overruled or sustained, . . . no abuse of discretion [will be] shown." Id.

Here, the defendant concedes that the un-redacted list was admissible at trial, as well as witness testimony as to the meaning of the Roman numerals next to the names on the list and the differing levels of deserved punishment the defendant assigned to them. The defendant argues, however, that the testimony should have stopped there, claiming that whether the defendant had threatened and/or intended to hurt teachers, classmates and neighbors, was in no way relevant to prove that he intentionally killed his father. In contrast, as it argued below, the State claims that the witnesses' testimony about circumstances surrounding the defendant's placement of their names on the list was necessary to establish the entire context out of which the charged crimes arose and to adequately describe the events leading up to the shooting. These are the third and fourth justifications stated in Dorsett.

Having reviewed the trial transcripts, we find that the trial court did not abuse its discretion in determining that the testimony of the defendant's former teachers and classmates was inextricably intertwined with the charged crime and that the probative value of such evidence was not outweighed by its prejudicial effect. See Dorsett, 944 So. 2d at 1215 ("Given these facts, without being able to explain the entire context and circumstances leading to the charged transaction, the jury would not have been presented with a true understanding regarding the officer's focus and attention on the defendant."); State v. Rambaran, 975 So. 2d

519, 525 (Fla. 3d DCA 2008) (permitting the State to introduce evidence of collateral crimes by the defendant against the two victims on two prior occasions because the prior events "provide an intelligent account of the events that led to the crimes being tried," where the defendant was charged with two counts of attempted murder).

The State is correct that providing testimony only as to the father's name appearing on The List and the meaning of the Roman numeral designation next to his name would not have provided the full context of when and how the defendant developed his hatred and premeditated intent to kill his father. Without more, the jury would have had little insight into the defendant's thought process or intent when creating The List—such as, what types of acts merited a person being designated a category I or II (just mad at person), and categories III (deserved punishment), IV (deserved severe, permanent punishment) and V (deserved death), and what moved a person up and/or down The List, as well as why only the father merited a category V.[3]

### *Evidence of the jail list*

***Background facts***

---

[3]  As to the defendant's claim that the testimony was relevant only to show his propensity to commit violence, the State correctly notes that several of the witnesses testified that they never even knew they were on The List, and there was no evidence that the defendant took any steps to harm any of the persons on The List, besides his father.

Prior to trial, Michael Nistal gave a statement to the police about jailhouse conversations he had had with the defendant. Mr. Nistal claimed that the defendant had told him that his neighbors who were potentially going to testify against him at trial were on his list and that he was going to kill them. The trial court ruled that the defendant's statements to Mr. Nistal were admissible as consciousness of guilt.

At trial, when the State asked Mr. Nistal about the list that the defendant kept while in jail, Mr. Nistal testified that the people on the list were cellmates and the defendant's aunt. The State then asked Mr. Nistal if he and the defendant had discussed the neighbors that might testify against the defendant at trial. Mr. Nistal answered yes to this, and also to the State's question whether the defendant told him that he wanted to kill the neighbors.

*Analysis*

As with The List, the defendant argues that Michael Nistal's testimony as to the existence of a second list was impermissible bad character evidence. We disagree.

Collateral crime evidence is admissible as relevant under section 904.402 of the Florida Statutes to show consciousness of guilt. See Grace v. State, 122 So. 3d 417, 418 (Fla. 4th DCA 2013) (permitting the State to introduce evidence that the defendant, who was charged with robbery, shot the robbery victim the night before

12

trial, finding it showed consciousness of guilt); <u>Waller v. State</u>, 943 So. 2d 865, 866 (Fla. 3d DCA 2006) (allowing the State to introduce evidence that the defendant threatened a witness prior to trial, finding "[t]he threat is relevant to the defendant's desire to evade prosecution and his consciousness of guilt."). This Court reviews the trial court's ruling on admissibility of this evidence for an abuse of discretion. <u>See</u> <u>Knight</u>, 15 So. 3d at 938.

Here, the State sought to establish through Mr. Nistal that the defendant had created another list while in jail, that the defendant's neighbors were on the list, and that the defendant wanted to kill the neighbors because they would testify against him at trial. As the State clearly had a valid legal basis—consciousness of guilt—for seeking to introduce this testimony, we find the trial court did not abuse its discretion in ruling it was admissible. Though the State failed to ask Mr. Nistal at trial if the neighbors were on this second list, which was part of his pre-trial statement to the police, we do not find this oversight amounts to reversible error in this case.

### *Evidence the defendant has Apserberg's syndrome*

### *Background facts*

Prior to trial, the State moved in limine to exclude any evidence that the defendant "may or does have autism and or Asperger's syndrome as this had no relevance to the crimes charged and would solely imply that there is a defense of

diminished capacity," citing to <u>Chestnut v. State</u>, 538 So. 2d 820 (Fla. 1989). The State also moved to exclude "any mention that the defendant has a 'different' or 'unusual' or 'weird' speech pattern or that the defendant is 'a little off' as that only goes to a possible defense of diminished capacity." At the motion in limine hearing, the defense argued that the defendant's condition would not be introduced "for the purpose of suggesting that he had a diminished mental capacity," but to "explain how his affect is and how he lacks emotion." The court granted the State's motion in limine as to both grounds.

At the conclusion of the pre-trial competency hearing, the subject of the court's rulings on the State's motions in limine as to Asperger's syndrome was raised again. Therein, defense counsel erroneously assumed that the State would be allowed to introduce testimony that the defendant is "loud," "weird," "odd," "bothersome" and speaks "differently." Therefore, the defense wanted to call an expert to say that the defendant suffers from Asperger's syndrome because it was "important for the Jurors to know the reason behind why he made those statements and in the manner in which they were made and how they were made." The defense also wanted the jury to know that the defendant has Asperger's syndrome as a way of explaining his physical demeanor in the courtroom.

Of course, it was the State that had moved in limine to exclude any testimony that the defendant is "different," "unusual," "weird" or a "little off" and

14

the court had granted that motion. On the continued insistence of defense counsel that the defense wanted the jury to be able to understand "why he is behaving that way," the court ultimately ruled that defense counsel could question the witnesses about the fact that defendant is "weird," "speaks oddly," "speaks in a monotone," and "speaks out of turn," but the defense could not bring in a doctor to say that the defendant has Asperger's syndrome.

At trial, defense counsel moved for a mistrial after opening statement for not being able to introduce evidence that the defendant has Asperger's syndrome. The court denied the motion. At the close of all the evidence, defense counsel again moved for a mistrial on this basis. The court denied the motion.

*Analysis*

The defendant argues that he should have been permitted to introduce evidence that the defendant has Asperger's syndrome at trial. We review the trial court's exclusion of this evidence for abuse of discretion. See Knight, 15 So. 3d at 938.

The State moved to exclude any mention that the defendant has Asperger's syndrome and that he is "different," "unusual," "weird" or a "little off." At defense counsel's insistence, the court ultimately permitted defense counsel to introduce evidence that the defendant is "weird," "speaks oddly", "speaks in a monotone," and "speaks out of turn" so that the jury could have some context for

understanding both his personal interactions with the trial witnesses and his odd courtroom demeanor.

Given defense counsel's narrow rationale for seeking admittance of this limited testimony in the lower proceedings, we find that the trial court did not abuse its discretion in ruling that the defense could not also bring in a doctor to testify that the defendant has Asperger's syndrome. It was enough for the jury to know that the defendant generally acted differently from most people. See Slicker v. State, 941 So. 2d 1191, 1994 (Fla. 2d DCA 2006) (permitting the defendant to introduce state-of-mind evidence through lay witnesses that the defendant was under physical and mental fatigue at the time of the charged crime, noting that the defense "did not attempt to introduce expert testimony that she suffered a mental abnormality"). Having a defense expert assign a medical condition to the defendant's conduct would not have assisted the jury any further on the narrow point for which this evidence was being introduced; any marginal relevance would have been outweighed by confusion of the issues and/or misled the jury. See § 90.403, Fla. Stat. (2013).

On appeal, the defendant makes an additional argument that was never made below: that the evidence the defendant has Asperger's syndrome demonstrates that he did not form the premeditated intent to kill his father in this case. Specifically, that the defendant merely compiled The List as a coping mechanism for his social

16

disorder, not because he actually wanted to kill his father. To this, the State correctly notes that the idea of a coping mechanism was briefly mentioned when the defendant's competency to stand trial was at issue, but it was never raised as a ground for admitting testimony of Asperger's syndrome at trial. Nor did the defendant ever proffer that it wanted to establish that people with Asperger's syndrome keep lists of any sort. Therefore, this issue was not preserved for appellate review. "Generally, an appellate court cannot address claims raised for the first time on appeal." Galvez v. Ramos, 941 So. 2d 475, 477 (Fla. 3d DCA 2006); see also Manning v. Tunnell, 943 So. 2d 1018, 1020 (Fla. 1st DCA 2006) (same).

In any event, even if this issue were preserved, this claim has no merit. The defendant tries to draw a distinction between using evidence of Asperger's syndrome to show he *could not* form the premeditated intent to kill—which the defendant concedes is clearly inadmissible—and the use of such evidence to refute the State's theory that he *had* such intent. This is a distinction without a difference as the Florida Supreme Court has found that such evidence is inadmissible for either reason.

In Chestnut, the Florida Supreme Court answered "no" to the following certified question of great public importance:

> Is evidence of an abnormal mental condition not constituting legal insanity admissible for the purpose of proving **either** that the

17

defendant could not **or did not** entertain the specific intent or state of mind essential to proof of the offense, in order to determine whether the crime charged, or a lesser degree thereof, was in fact committed?

538 So. 2d at 820 (emphasis added). The certified question itself contemplates the position argued by the defendant on this appeal—using evidence of Asperger's syndrome to prove that the defendant did not have premeditated intent.

Likewise, in setting out the issue before it in Chestnut, the Florida Supreme Court cited authority that explained that labels like "diminished capacity" are "shorthand for the proposition that expert evidence of mental abnormalities is admissible on the question of whether the defendant in fact possessed a particular mental state which is an element of the charged offense." Id. at 822-23 (quoting Muench v. Israel, 715 F. 2d 1124, 1142-43 (7th Cir. 1983)). "When a court rejects the doctrine of diminished capacity, it is saying that the psychiatric evidence is inadmissible on the *mens rea* issue." Id. at 823. Upon analyzing the broad question before it, and answering it in the negative, or supreme court concluded that unless the alleged mental deficiency meets the definition of insanity, "[p]ersons with less serious mental deficiencies should be held accountable for their crimes just as everyone else." Id. at 825; see also Nelson v. State, 43 So. 3d 20, 30 (Fla. 2010) (finding that trial counsel was not ineffective for failing to call a doctor to "establish that Nelson lacked mens rea" where Nelson suffered from

18

schizoaffective disorder because "[o]ur precedent has firmly established the inadmissibility of evidence relating to mental capacity absent an insanity plea").

Thus, Chestnut clearly contemplated not only circumstances where the defense sought to argue that the defendant *could not* form the intent to commit a crime because of a mental infirmity, but also where, as here, the defense sought to argue that the defendant's mental infirmity was evidence that he *had not* formed the intent to commit the crime. While the defendant is correct that the Florida Supreme Court did not apply Chestnut where the defendant allegedly had an epileptic seizure during the commission of the crime, that case did not concern a mental deficiency. See Bunney v. State, 603 So. 2d 1270, 1273 n.1 (Fla. 1992) (noting that conditions like epilepsy, infancy and senility are "commonly understood conditions that are beyond one's control," but that, even then, such evidence would not be admissible to the extent the defense sought to introduce evidence "relating to a general mental impairment").

And, while the First District Court of Appeal may have permitted a defendant to present expert testimony that the defendant's "calm" demeanor immediately following a shooting death suggested that the defendant was in "shock" so as to rebut the State's argument that his calm demeanor was "indicative of his cold-blooded nature," that case also did not involve a mental deficiency of any kind. See Dorbad v. State, 12 So. 3d 255, 258-59 (Fla. 1st DCA 2009).

Therefore, the <u>Dorbad</u> court did not even cite to <u>Chestnut</u>, or even address the type of distinction that the defendant urges here.

For the foregoing reasons, we find that <u>Chestnut</u> precludes the introduction of evidence that the defendant has Asperger's syndrome for the purpose of proving that the defendant did not have premeditated intent to kill.

### ***Evidence of the 911 call***

#### ***Background facts***

Approximately one minute after shooting his father, the defendant called 911 and told police dispatch, "Please, come quickly, I accidentally shot my father." The defendant said on the call that he was going hunting with his father and that he had gone into the bathroom to show his father a shotgun, which accidentally went off even though the safety was on. The State does not dispute either the timing of the 911 call, or that the defendant sounded hysterical on the 911 recording.

Frank Alfonso, a neighbor, was outside washing his car when he heard a loud boom that sounded like a gunshot come from inside the defendant's house. Seconds after hearing the noise, Mr. Alfonso heard a voice inside the defendant's home call out, "Oh, my God, call 911." Mr. Alfonso then heard the same voice, still inside the home, speaking to the 911 operator.

The State moved in limine to exclude "[a]ny and all mention of self-serving statements of the defendant," including "the defendant's statements to the 911

20

operator" and "statements made to witnesses . . . following the crime after he told witness Frank Alphonso to call the police." At the motion in limine hearing, the trial court ruled the 911 call inadmissible hearsay that did not satisfy the excited utterance exception to the hearsay rule because the defendant had an opportunity to contrive the call, making it untrustworthy. Specifically, the defendant had shown the shotgun to a neighborhood friend, Lisa Syren, a couple of weeks before the shooting and told her that he wanted to kill his father and make it look like self-defense. As the court explained, "If you go ahead and say: 'I am going to create this startling event,' and then all of a sudden that startling event occurs, then that is the connection." The court expounded, "The point is that when you have an opportunity to fabricate or contrive or misrepresent that it is self-defense, or that you are making the statement that, yes, 'I want to kill my father,' there is nothing spontaneous about that kind of statement."[4]

At trial, the court agreed to listen to the 911 call and, after doing so, again ruled that the tape was inadmissible hearsay because of the evidence the call was contrived.

*Analysis*

---

[4] There is an element of spontaneity in both the spontaneous statement and the excited utterance exceptions to the hearsay rule. It is clear on this record that the court based its ruling on the law applicable to excited utterances.

The defendant argues that his 911 call to the police satisfies the excited utterance exception to the hearsay rule. See § 90.803(2), Fla. Stat. (2013). "Whether the necessary state of mind is present for a court to admit a statement as an 'excited utterance' exception is a preliminary fact for the trial court's determination." Cotton v. State, 763 So. 2d 437, 440-41 (Fla. 4th DCA 2000) (en banc) (citing Charles W. Ehrhardt, Florida Evidence § 803.2 (1998 Ed.)); see also Tucker v. State, 884 So. 2d 168, 173 (Fla. 2d DCA 2004) ("To admit an excited utterance, the trial court must conclude that the preponderance of the evidence supports the factual circumstances permitting the introduction of the statement as an excited utterance."). Our standard of review on appeal is abuse of discretion. Cotton, 763 So. 2d at 441.

The "excited utterance" exception to the hearsay rule requires that the out-of-court statement relate to "a startling event . . . made while the declarant was under the stress of excitement caused by the event." § 90.803(2), Fla. Stat. (2013). As explained by the Florida Supreme Court, "in order for an excited utterance to be admissible, the following requirements must be met: (1) there must have been an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must have been made while the person was under the stress of excitement caused by the startling event." Stoll v. State, 762 So. 2d 870, 873 (Fla. 2000). Here, the

22

parties' focus is solely on the second prong—that is, whether the 911 call was made before there was time to contrive or misrepresent.

As to the second prong, the Florida Supreme Court has noted that if "the time interval between the [startling] event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." State v. Jano, 524 So. 2d 660, 662 (Fla. 1988) (quoting McCormick on Evidence, § 297 (3d ed.)); see also Hutchinson v. State, 882 So. 2d 943, 952 (Fla. 2004), abrogated on other grounds by Deparvine v. State, 995 So. 2d 351 (Fla. 2008) ("There is no evidence in the record to show what occurred between the fight with Hutchinson [(the startling event)] and [Renee's] phone call to Pruitt. Absent some evidence that Renee did not engage in reflective thought, the statement to Pruitt cannot be admitted as an excited utterance."); Rogers v. State, 660 So. 2d 237, 240 (Fla. 1995) (permitting a witness to testify to statements the victim made eight to ten minutes after calling the police because "[a]lthough there conceivably was time for [the victim] to engage in reflective thought, the record indicates that [the victim] did not engage in any reflection"). Citing to these cases, the defendant claims that the court can look *only* to the time period between the startling event and the out-of-court statement when determining whether the statement should be excluded. We disagree.

In applying the three-part test for an excited utterance, "[f]actors that the trial judge can consider in determining whether the necessary state of stress or excitement is present are the age of the declarant, the physical and mental condition of the declarant, the characteristics of the event and the subject matter of the statements." Jano, 524 So. 2d at 661 (quoting Charles W. Ehrhardt, Florida Evidence § 803.2 at 473-74 (2d ed. 1984)). When conducting this analysis, it is important to remember that "[a]n excited utterance is admissible as an exception to the hearsay rule because the declarant does not have the reflective capacity necessary for conscious misrepresentation. Thus, statements made by someone who is excited are *spontaneous* and have *sufficient guarantees of truthfulness*." Rogers, 660 So. 2d at 240 (emphasis added) (citing Charles W. Ehrhardt, Florida Evidence § 803.2 (1994 ed.)); see also Blandenburg v. State, 890 So. 2d 267, 270 (Fla. 1st DCA 2004) (stating that "excited utterances are admissible because the circumstances under which such statements are made provide certain guarantees against 'conscious misrepresentation'" (quoting Rogers, 660 So. 2d at 240)). Spontaneity is therefore paramount.

In examining the comparable federal rules governing hearsay exceptions for spontaneous statements—which include excited utterances—one popular treatise explains that "since spontaneity is the principal, and often the only, guarantee of trustworthiness for the exceptions . . ., its absence should result in exclusion of the

24

statement. Circumstances indicating a lack of spontaneity, which may be related to the self-serving character of the statement, are accordingly extremely important to the determination of admissibility." 2 McCormick on Evidence, § 270 (7th ed.). Along the same lines, another treatise explains that a statement may not be spontaneous where there is evidence of fabrication:

> It has been broadly stated that the test of admissibility of statements as excited utterances is their spontaneity. "Spontaneity" refers to the state of mind of the person making the statement. . . . In determining whether the declaration was spontaneous, a court may consider such elements as the lapse of time between the main act and the declaration, **the opportunity or likelihood of fabrication**, the inducement to fabricate, the declarant's actual excitement, the place of the declaration, the presence there of visible results of the act or occurrence to which the utterance relates, whether the utterance was made in response to a question, whether the declaration was in narrative form, and whether the declaration was against interest or self-serving.

31A C.J.S. Evidence § 493 (2017) (footnotes omitted) (emphasis added); see also 2 McCormick on Evidence, § 272 (7th ed.) ("The rationale for the [excited utterance] exception lies in the special reliability that is furnished when excitement suspends the declarant's power of reflection and fabrication.").

Here, the motion in limine hearing transcripts reflect that the trial court was concerned that the defendant's statements to 911 dispatch were not at all "spontaneous" given the defendant's stated motivation to stage the shooting death of his father with a shotgun that he showed his friend, Ms. Syren, which had occurred just two weeks before the defendant actually shot his father with the same

25

shotgun. The court therefore excluded the defendant's comments to the 911 operator because there was evidence that that the defendant had contrived both the shooting (the startling event) and the 911 call (the out-of-court statement).[5]

In essence, the court below excluded the 911 call because the defendant could not satisfy his burden of demonstrating that he was under any stress or excitement at the time he called 911 and gave his self-serving statement. "The mere fact that statements are self-serving is not, in and of itself, a sufficient evidentiary basis for their exclusion from evidence." Stiles v. State, 672 So. 2d 850, 851-52 (Fla. 4th DCA 1996) (quoting Alexander v. State, 627 So. 2d 35, 43 (Fla. 1st DCA 1993)). Nevertheless, the self-serving nature of the statement is still a factor that can be considered when determining whether the statement was fabricated. See Sunn v. Colonial Penn Ins. Co., 556 So. 2d 1156, 1157 (Fla. 3d DCA 1990) (noting that one of the factors to be analyzed in determining whether a statement qualifies as an excited utterance includes "whether the statement is self-serving"); 2 McCormick on Evidence, § 272 (7th ed.) ("Although not grounds for

---

[5] At the motion in limine hearing, defense counsel accused the trial court of believing
Ms. Syren's testimony that the defendant had told her that he wanted to kill his father and make it look like self-defense. The court responded, "I am merely considering the State's position" and that "whether the statement is true or not, that's not a position for this Court to say, one way or the other." The court also stated that it was focusing on whether the defendant "had an opportunity to misrepresent," an "opportunity to reflect." As noted in Jano, it is the opportunity to reflect that raises the possibility of fabrication and calls into question the trustworthiness of the declarant's statement. 524 So. 2d at 662.

automatic exclusion, evidence that the statement . . . was self-serving is an indication that the statement was the result of reflective thought.") (footnotes omitted).

To this end, we find persuasive two federal cases that have touched upon this issue, albeit in dicta. See United States v. Moore, 791 F. 2d 566, 571 (7th Cir. 1986); United States v. Knife, 592 F. 2d 472 (8th Cir. 1979). In Knife, the Eighth Circuit Court of Appeals opined that where there was evidence that the declarant had planned the shooting of the victim at a particular time, which then took place, that "it would be difficult to believe that the preplanned shooting . . . was an event so startling or unexpected as to suspend the defendant declarant's powers of reflection." 592 F. 2d at 481, n.10. In Moore, the Seventh Circuit Court of Appeals noted that "[t]he statement in Knife assumes that the timing, location and circumstances of the [startling] event . . .were within the declarant's control." 791 F. 2d at 571. But, the Seventh Circuit declined to apply it because the declarant in Moore did not have the requisite control over the event in question. Id. Here, the defendant clearly had the requisite control over the time, location and circumstances of the shooting.

For these reasons, we find the trial court did not abuse its discretion in excluding the 911 call as hearsay. Moreover, because of this, we find no

27

reversible error in the lower court's decision also to exclude testimony that the defendant's neighbor, Mr. Alfonso, heard the defendant making the 911 call.

### *Closing arguments*

#### *Background facts*

During closing argument, the prosecutor made fifteen comments that are challenged on appeal. The defendant categorizes these comments as either misleading, improper comment on the defendant's right to remain silent, or denigration of the defense. The defense objected to (and sought a mistrial for) only four comments; the remaining eleven complained-of comments received no objection.

#### *Analysis*

"Ordinarily, to preserve a claim based on improper comment, counsel has the obligation to object and request a mistrial. If counsel fails to object or if, after having objected, fails to move for a mistrial, his silence will be considered an implied waiver." Nixon v. State, 572 So. 2d 1336, 1340 (Fla. 1990). For preserved error, a trial court's ruling on a motion for mistrial is reviewed for abuse of discretion. See Jordan v. State, 176 So. 3d 920, 927 (Fla. 2015). Where the defense fails to preserve the error, this court applies a fundamental error review. Id. at 929. Here, the State rightly notes that eleven of the fifteen comments were not objected to and are therefore subject to fundamental error analysis.

As to the preserved errors, the parties agree that they fall into two categories. The first category is the prosecutor's comment that the defendant "didn't try to save his father," which the defense claims was misleading. We find that the trial court did not abuse its discretion denying the motion for mistrial as to this comment where the context of the prosecutor's surrounding statements demonstrates the State was not exploiting the exclusion of the 911 call from evidence. To this end, the prosecutor painted a picture of what might have happened on the morning of the shooting, all of which suggested that it was premeditated: "[H]e walked into that bathroom and stood 24 inches from his father's face that he could clearly see with his finger on the trigger. He leveled that shotgun, he aimed it and he fired. Bang." The prosecutor also noted that there was no blood on the defendant's clothing at the crime scene.

The second category of preserved error are the three comments purportedly directed at the defendant's right to remain silent. Such comments are reversible error where "the only person who could have testified at trial" as to what took place was the defendant. Dean v. State, 690 So. 2d 720, 724 (Fla. 4th DCA 1997); Marshall v. State, 473 So. 2d 688, 689 (Fla. 4th DCA 1984), quashed on other grounds by State v. Marshall, 476 So. 2d 150 (Fla. 1985) ("Since only two people witnessed the events in question, and one of those chose not to testify, we cannot accept the state's argument that the prosecutor's remarks amounted to nothing

more than a comment on 'the evidence as it existed before the jury.'"). The first objected-to comment was, "I submit to you there is no other explanation for this defendant walking into that bathroom with a loaded shotgun . . . standing 24 inches from his father's face and pulling the trigger." On rebuttal, the State similarly commented, "[The shooting] occurred with that shotgun that you've seen time and time again; that you know fits well into the bathroom for which there is no other explanation for him to walk into with it." We find that the trial court did not abuse its discretion in denying a mistrial as to either of these comments as they were not directed at the defendant's right to remain silent.

Unlike the cases relied upon by the defendant, the prosecutor did not explicitly or even implicitly comment on the defendant's failure to testify. See Dean, 690 So. 2d at 724 ("Is there any other reasonable explanation[?] *If there is you haven't heard it in this trial*."); Marshall, 476 So. 2d at 151 ("Ladies and gentlemen, the only person you heard from in this courtroom with regard to the events of November 9, 1981, was Brenda Scavone [the victim]."); Cunningham v. State, 404 So. 2d 759, 759 (Fla. 3d DCA 1981) ("That has not been explained in this case" and "I think counsel owes you an explanation for that."). Moreover, as the trial court found here in denying the motion for mistrial, "[the defendant] is not the only one who can testify as to what happened. There were other witnesses who came to the house and observed the bathroom. And furthermore, there were other

30

witnesses who testified what he said. So to say he's the only one who can explain something, that [sic] not the case here. He's not the only witness. He would not have been the only witness to rebut solely what was said."

The other objected-to comment was made in response to this remark by defense counsel during his closing argument: "Because, look at the floor. It looks like this rug or towel or whatever it is, it's all rumpled up. It's not laying flat like it would normally be. It's all rumpled up inside the bathroom at a point where a person would be holding the shotgun in their hands, pointing it up, like this, and the gun goes off." On rebuttal, the State commented, "It was about an hour and 35 minutes or so of argument about sympathy and bias and blame it on Jay Beckman to hear something about the towel on the floor, a scrunched up towel on the floor. Did somebody say anything about a towel on the floor?" We find that the trial court did not abuse its discretion in denying a mistrial as to this rebuttal remark as it was merely a fair comment on the evidence, where the photographic evidence depicted a floor mat, not a towel, on the floor of the bathroom.

As to the unpreserved errors, this court looks to whether the cumulative effect of any improper closing arguments deprived the defendant of a fair trial, i.e., fundamental error. See Bell v. State, 108 So. 3d 639, 650 (Fla. 2013). "Fundamental error is that which 'reaches down into the validity of the trial such that a guilty verdict . . . could not have been obtained without the assistance of the

31

alleged error.'" Id. at 650 (quoting Wade v. State, 41 So. 3d 857, 868 (Fla. 2010)).

Viewing the entire closing argument in context, we find that these comments—viewed individually or collectively—do not rise to the level of fundamental error.

### *The Apprendi issue*

#### *Background facts*

The defendant was convicted of first-degree murder, a capital felony punishable by a term of forty years to life imprisonment. See § 775.082(1)(b), Fla. Stat. (2015); § 782.04(1)(a)1., Fla. Stat. (2015). Because he was seventeen years and twenty-nine days old at the time of the offense, the trial court conducted an individualized sentencing hearing pursuant to Miller v. Alabama, 567 U.S. 460 (2012) to determine whether life imprisonment was appropriate. See § 921.1401, Fla. Stat. (2015). The court sentenced him to life in prison without parole.

While the defendant's appeal before this court was pending, on February 2, 2016, the defendant filed a Florida Rule of Criminal Procedure 3.800(b)(2) motion in the lower court. Therein, the defendant argued that his life sentence violated the Sixth Amendment to the U.S. Constitution under Apprendi v. New Jersey, 530 U.S. 466 (2000) because the trial judge, rather than a jury, was the one who considered the factors set forth in Miller and who determined a life sentence without parole was appropriate. In the alternative, the defendant argued that he was entitled to judicial review of his sentence after twenty five years.

At the short hearing on the motion, the trial court stated that it was going to deny the motion as to the Apprendi issue, but grant the motion as the judicial review aspect of his sentence. The trial court thereafter entered an amended sentencing order consistent with its oral ruling, sentencing the defendant to life with judicial review after twenty five years.

*Analysis*

A claim of error under Apprendi and Miller raises a pure question of law and is, therefore, subject to de novo review. See Plott v. State, 148 So. 3d 90, 93 (Fla. 2014).

In Apprendi, the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. For purposes of Apprendi, this statutory maximum "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose **without** any additional findings." Blakely v. Washington, 542 U.S. 296, 303-04 (2004). Apprendi is based on the right to a jury trial under the Sixth Amendment to the U.S. Constitution.

In Miller v. Alabama, 567 U.S. 460 (2012), the United States Supreme Court held that imposing a mandatory life sentence on a juvenile without the possibility of parole violates the Eighth Amendment to the U.S. Constitution. Recognizing

33

that juveniles have "diminished culpability and heightened capacity for change," the Court set forth a number of factors that should be considered before imposing a life-without-parole sentence. Id. at 468-69. In Montgomery v. Louisiana, 136 S. Ct. 718, 735 (2016), the Court determined that Miller should be applied retroactively, also emphasizing that "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." In response, Florida and other states passed legislation in order to satisfy the procedural requirements set forth in Miller, specifying that the trial court shall conduct an individualized sentencing hearing when considering whether to impose a life without parole sentence on a juvenile convicted of a capital crime. See Ch. 2014-220, §§ 1, 3, Laws of Fla.; § 775.082, Fla. Stat. (2015); § 921.1401, Fla. Stat. (2015).

On this appeal, the defendant claims Florida's juvenile sentencing procedure—which the Florida Legislature passed to satisfy the individual sentencing requirements for juveniles contemplated by Miller and therefore not to violate the Eighth Amendment—violates the Sixth Amendment under Apprendi and its progeny. This is because the trial court, not the jury, considers the "defendant's youth and attendant circumstances" in determining whether a sentence of life imprisonment "is an appropriate sentence." See § 921.1401(1)-(2),

34

Fla. Stat. (2015). This appears to be an issue of first impression in Florida and there is very little case law from other jurisdictions that directly addresses this question.

We are, however, persuaded by the rationale in People v. Hyatt, 891 N.W. 2d 549 (Mich. App. Ct. 2016). In Hyatt, the Michigan Court of Appeals noted that, in Apprendi, the United States Supreme Court was careful to specify that "nothing . . . suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence *within statutory limits* in the individual case." Hyatt, 891 N.W. 2d at 557 (quoting Apprendi, 530 U.S. at 481). Thus, where a sentencing judge imposes a sentence within the range prescribed by statute, "any facts found function[] as mere sentencing factors, rather than elements of an aggravated offense." Id.

After conducting further analysis of the numerous cases that followed Apprendi, including Hurst v. Florida, 136 S. Ct. 616 (2016) and Ring v. Arizona, 536 U.S. 584 (2002) (both death penalty cases), the Hyatt court concluded that Apprendi and its progeny permit "a judge acting within the range of punishment authorized by statute [to] exercise his or her discretion—and find facts and

consider factors relating to the offense and the offender—without violating the Sixth Amendment." Hyatt, 891 N.W. 2d at 561.

With this backdrop, the Hyatt court found that "the instant case is not one in which the finding of a particular fact increases the maximum penalty. Nor does the case involve a statutory scheme that makes imposition of life without parole contingent on any particular finding." Id. at 564. Rather, the individualized sentence is "required to ensure proportionality, not to aggravate the maximum penalty available under the law." Id. In other words, "the remodeling that Miller performed on life-without-parole sentences for juveniles did not touch the ceiling—or floor, for that matter—of the available sentence for juvenile homicide offenders." Id. at 564-65. The Hyatt court further noted that "nowhere in Miller's individualized sentencing mandate is the idea that Miller altered the maximum punishment available for juvenile offenders or made the imposition of any punishment contingent on fact-finding"; thus, distinguishing this type of case from the death penalty cases, where the sentencing statute at issue there impermissibly required the court to make additional findings on certain aggravating factors before imposing a death sentence. Id. at 565.

The Hyatt court then turned to Michigan's different, but sufficiently analogous, juvenile sentencing statute.[6] See MICH. COMP. LAWS § 769.25 (2014).

---

[6] This is not to say that Florida and Michigan's statutes are at all identical. On the contrary, there are several notable differences between the legislation. It suffices

36

The court found that "our Legislature did not alter the statutory maximum sentence that may be imposed solely on the basis of the jury's verdict, nor did our Legislature make imposition of the statutory maximum dependent on any particular finding of fact." Id. at 566. Rather, "[t]he sentencing judge decides whether to exercise his or her discretion to impose that statutory maximum by considering the so-called Miller factors to satisfy Miller's individualized sentencing mandate." Id. at 567.

Next, the Hyatt court noted that the subject statutory scheme actually "sets forth a framework of mitigation, rather than aggravation" as it has the effect of "mitigating the maximum penalty authorized by the jury's verdict rather than aggravating the penalty beyond that which was set forth by law"; thus, reserving life sentences for "the rare juvenile deserving of the harshest penalty." Id. at 569. As the court explained, "Eighth Amendment prohibitions [in Miller] are considered to be mitigating factors that act as a bar against imposing the statutory maximum penalty, rather than as elements that enhance the maximum possible penalty, and the determination of whether those mitigating factors exist need not, under Apprendi and its progeny, be made by a jury." Id. at 570.[7]

to say, though, that they are sufficiently similar: both authorize a life sentence without parole for a juvenile convicted of premeditated murder; both direct the trial court to conduct an individualized sentencing hearing at which the court is to consider the factors listed in Miller; and both direct the court to determine whether to impose a life sentence.

[7] Though the Hyatt court found Michigan's individualized sentencing scheme for

37

A California appellate court similarly rejected this same <u>Apprendi</u> argument in <u>People v. Blackwell</u>, 207 Cal. Rptr. 3d 444 (Cal. Ct. App. 2016). In that case, the court found no <u>Apprendi</u> violation in permitting the trial judge to engage in "discretionary consideration of mitigating circumstances so that [it] can reach a moral judgment about an individual juvenile's irreparable corruption, i.e., a determination of what sentence is proportionate to a particular offense and offender." <u>Id.</u> at 466.

For these reasons, we find that Florida's juvenile sentencing procedure set forth in section 921.1401, as contemplated by <u>Miller</u>, does not violate the Sixth Amendment under <u>Apprendi</u> and its progeny.

### *<u>Conclusion</u>*

For the foregoing reasons, we find that the trial court did not abuse its discretion in: (1) admitting The List under section 90.402 because it was inextricably intertwined with the charged crime; (2) admitting Mr. Nistal's testimony as to the jail list under section 90.402 because it showed the defendant's consciousness of guilt; (3) precluding the defense from introducing testimony that

---

juveniles did not violate the Sixth Amendment under <u>Apprendi</u> and its progeny, the court did go on to find that trial court had abused its discretion in imposing a life sentence on the juvenile under the facts of that case, as it relates to <u>Miller</u>. <u>Id.</u> at 578-79. To this, we note that the instant defendant has raised no challenge to the propriety of the trial court's decision to impose a life sentence without parole after conducting the individualized sentencing hearing required by section 921.1401 of the Florida Statutes. Therefore, we do not address it.

the defendant had Asperger's syndrome where it would not have assisted the jury on the narrow point for which the defense sought to introduce it below, any probative value would be outweighed by its prejudicial effect, and such evidence is otherwise impermissible to prove that the defendant did not have premeditated intent to kill; (4) excluding the 911 call for failure to satisfy the excited utterance clause to the hearsay exception because of evidence the call was fabricated; and (5) as to preserved error, denying the defense motion for mistrial based on improper closing argument; additionally, we find that none of the unpreserved comments rise to the level of fundamental error. Finally, we find that Florida's juvenile sentencing procedure set forth in section 921.1401 does not violate the Sixth Amendment to the U.S. Constitution under Apprendi and its progeny.

Accordingly, we affirm the defendant's conviction and sentence for first degree murder.

Affirmed.